

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-13-1995

# Troster v PA State Dept Corr

Precedential or Non-Precedential:

Docket 94-3162

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Troster v PA State Dept Corr" (1995). *1995 Decisions.* Paper 253.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/253

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


NO. 94-3162


DIETER H.M. TROSTER

v.

PENNSYLVANIA STATE DEPARTMENT OF
CORRECTIONS; JOSEPH D. LEHMAN, COMMISSIONER;
FREDERICK ROSEMEYER, SUPERINTENDENT

DIETER TROSTER,
                                        Appellant



On Appeal From the United States District Court
For the Western District of Pennsylvania
(D.C. Civ. No. 94-cv-00131)



Argued:  September 22, 1994

Before:  BECKER, COWEN, Circuit Judges,
    and GARTH, Senior Circuit Judge

(Filed: September 13, 1995)

                              BRUCE   V.   HICKS,   ESQUIRE
(ARGUED)

                              JOHN H. BINGLER, ESQUIRE
                              Thorp, Reed & Armstrong
                              One Riverfront Center
                              Pittsburgh, PA   15222

                              WITOLD J. WALCZAK, ESQUIRE
                              American   Civil   Liberties
Union

                              237 Oakland Avenue
                              3rd Floor
                              Pittsburgh, PA   15213

                              Counsel for Appellant

1

ESQUIRE

ESQUIRE (ARGUED)

ERNEST D. PREATE, JR.,
Attorney General
THOMAS F. HALLORAN, JR.,

GLORIA A. TISCHUK, ESQUIRE
CALVIN R. KOONS, ESQUIRE
JOHN G. KNORR, III, ESQUIRE
Office of Attorney General
 of Pennsylvania
564 Forbes Avenue
Manor Complex
Pittsburgh, PA   15219

Counsel for Appellees

OPINION OF THE COURT


BECKER, Circuit Judge.

Appellant Dieter Troster, an employee of the State Correctional Institution at Greensburg, Pennsylvania ("SCI"), is in danger of losing his job as a corrections officer because, as a matter of principle, he refuses to wear an American flag patch on his uniform as required by departmental regulations. He filed suit in the District Court for the Western District of Pennsylvania against the Pennsylvania State Department of Corrections, its Commissioner Joseph D. Lehman, and SCI Superintendent Fredric A. Rosemeyer, seeking injunctive and declaratory relief under 28 U.S.C. § 1983. After holding an evidentiary hearing, the district court denied Troster's request for a preliminary injunction. The Pennsylvania Department of Corrections then ordered Troster suspended for five days for gross insubordination. This court granted an emergency motion

2

for an injunction pending appeal, and Troster has remained on the job. Troster has appealed the district court's order denying him a preliminary injunction.

Troster advances two theories to support his allegations that the threatened disciplinary action violates his rights under the First and Fourteenth Amendments. First, he advances a "compelled speech" argument--that the flag patch regulation that he refuses to observe unconstitutionally compels him to engage in expressive or symbolic conduct. Second, he presses a "symbolic protest" theory, under which he urges that his refusal to comply with the department regulation should be protected as expressive or symbolic conduct intended and likely to communicate his opposition to being compelled to "speak" by wearing the flag patch.

In Part 8 of this opinion we hold that Troster did not demonstrate a likelihood of success on the merits of his compelled expression claim. Even recognizing that in the wake of Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 115 S. Ct. 2338, 2344 (1995), the threshold test of expressiveness necessary to raise a First Amendment compelled expression claim is no longer as stringent as we previously suggested in Steirer by Steirer v. Bethlehem Area Sch. Dist., 987 F.2d 989 (3d Cir. 1993), see infra at 9-11 & n.11, we believe that on the record before it the district court properly concluded that the Department's flag patch regulation did not require correctional officers such as Troster to engage in any conduct sufficiently imbued with elements of communication that

3

the regulation might be forbidden by the First Amendment's proscription against compelled speech.

With respect to the alternative symbolic protest theory, we conclude in Part 17 that, under the particular facts of this case, Troster has not stated an analytically independent claim of constitutional violation. One who violates a governmental compulsion to speak or engage in expressive conduct merely to express opposition to that compulsion on "compelled expression" grounds engages in no independently constitutionally protected conduct. In such a case the appropriate rubric for a First Amendment claim is simply "compelled expression," and that is therefore the sole free speech theory that we consider. As noted, it fails on the present record. Accordingly, the order of the district court denying Troster's motion for a preliminary injunction must be affirmed.

1. FACTS AND PROCEDURAL HISTORY

Dieter Troster is a naturalized American who emigrated to the United States from Germany when he was in his early twenties. He enlisted in the U.S. army, went to Officers' Candidate School, became an officer, and was eventually promoted to the rank of Major. In 1981 he retired after twenty years of service, including time in Viet Nam. Two years later Troster secured employment with SCI. He has since received promotions taking him from Corrections Officer Trainee to Corrections Officer 2 with the rank of Sergeant. His duties include supervising inmates acting as janitors and directing other corrections officers in their assigned tasks. Troster is also a

4

Training Sergeant, and he thus serves as an example to lower ranking corrections officers.

In 1991, the American Federation of State, County and Municipal Employees, the bargaining representative for the corrections officers, requested the Department to allow officers to wear an American flag patch on their uniforms. The Department adopted a regulation allowing officers up through the rank of Sergeant to wear an American flag patch on the right shoulder sleeve of their uniform shirts. The patch authorized by the Department displays the flag with the star field oriented toward the officer's back (with the star field in its customary position in the upper left corner of the flag). Although the original regulation was permissive, on February 15, 1993 the Department promulgated new uniform regulations (effective March 15) that mandated display of the flag patch on the right sleeve of the uniform shirt, star field oriented toward the rear.

The Department adopts regulations concerning uniforms, including the flag patch regulation, with the intent of projecting the image of a professional correctional force. The district court found that such an image is important to the overall operations and security of SCI. The presence of the American flag patch is now one of the identifying features of a corrections officers's uniform, which indicates, the district court found, that the wearer is authorized to exercise the lawful powers of corrections officers, including the use of firearms. The district court accepted Superintendent Rosemeyer's contention that the Department's interest in displaying the American flag as

5

part of the uniform is legitimate because it fosters loyalty and obedience to superior officers.

Almost immediately upon adoption of the mandatory flag patch regulation, Troster objected to being compelled to display the American flag. He believes that state-compelled display desecrates the flag and debases it. Troster considers the required displays deeply objectionable not only because of his conviction that the American flag symbolizes freedom from state-coerced political or patriotic speech, but also because, in his view, displaying the flag with its star field to the rear signifies cowardice and retreat from the principles for which the flag stands. Troster further believes that the "New Flag Code" Resolution adopted by Congress in 1976, 36 U.S.C. §§ 173-177, does not authorize corrections officers to wear the flag as part of their uniform (although he does not press this argument on appeal).

In May 1993, in response to Troster's objections, the Department decided not to enforce the flag patch regulation pending review by the Department's General Counsel. Thus, the regulation remained optional or unenforced from the spring of 1991 to January 27, 1994, with few if any disciplinary problems resulting. Operations ran smoothly at SCI during this time.

Nevertheless, despite the fact that Troster's performance as a corrections officer had otherwise been completely satisfactory, on January 20, 1994 the Superintendent of SCI notified Troster that the Department would begin enforcing the flag patch requirement on January 27, and that he must comply

6

or face disciplinary proceedings. Troster continued to refuse to wear the flag, and on January 26 he filed this 28 U.S.C. § 1983 action seeking declaratory and injunctive relief against the mandatory aspect of the Department's flag patch regulation. The next day the Department ordered Troster to appear at a fact finding meeting.

There, Troster was advised that his continuing refusal to comply with the regulation constituted gross insubordination and violated specific paragraphs of the Correctional Officer's Code of Ethics. A disciplinary hearing was set for February 8. In the interim, however, a short-term agreement between Troster's and the Department's counsel allowed Troster to continue working without wearing the patch. Except for that temporary dispensation for Troster, the Department has enforced the regulation uniformly since the end of January 1994.

On February 1, 1994, Troster moved for a preliminary injunction against the Department's attempts to discipline him and against the mandatory aspect of the flag patch regulation on which those proceedings were based. On February 3, the district court held a hearing on this motion, at which time the Corrections Department agreed to stay disciplinary proceedings against Troster until the court ruled on the injunction.

By order dated March 18 the district court denied Troster's motion. The court concluded that Troster had failed to demonstrate a likelihood of success on the merits because neither the flag patch regulation nor Troster's refusal to wear the patch was sufficiently expressive to be protectable under First

7

Amendment free speech rights. Five days later, Troster moved for reconsideration or injunction pending appeal. Two days after this motion the Corrections Department held a pre-disciplinary conference; four days later the district court denied Troster's request for reconsideration. On April 4 Troster filed a notice of appeal. The next day, he moved in this court by motion for an emergency injunction pending appeal. Defendants notified Troster that if he continued to refuse to wear the flag patch, he would be suspended for five days commencing April 9. On April 8, a motions panel of this court granted Troster's motion for an injunction pending appeal. We have jurisdiction under 28 U.S.C. § 1292(b). We review the grant or denial of a preliminary injunction for abuse of discretion; the district court's discretion is abused if it erred in stating or applying the law. See Frumer v. Cheltenham Tp., 709 F.2d 874, 876 (3d Cir. 1983).

2. THE COMPELLED EXPRESSION CLAIM

a.

Troster objects to the compulsory aspect of the Department's flag patch regulation on the grounds that it compels him to engage in expressive conduct in violation of the First Amendment. "[T]he protection granted by the First Amendment is not limited to verbal utterances but extends as well to expressive conduct." Steirer by Steirer v. Bethlehem Area Sch. Dist., 987 F.2d 989, 994 (3d Cir. 1993). Moreover, "[t]he freedom of speech protected by the First Amendment, though not absolute, includes both the right to speak freely and the right to refrain from speaking at all." Id. at 993 (quoting Wooley v.

8

*Maynard*, 430 U.S. at 714, 97 S. Ct. at 1435) (internal quotation marks and footnote omitted).

We are not dealing here with compelled disclosure of personal or private information. *See, e.g.,* Leora Harpaz, *Justice Jackson's Flag Salute Legacy: The Supreme Court Struggles to Protect Intellectual Individualism*, 64 TEX. L. REV. 817, 818 (1986) (distinguishing "[t]wo distinct kinds of liberty interest [that] support the right to refrain from expressive activity[,] . . . . an interest in not being forced to reveal information about personal beliefs or associations . . . . [and] an interest in not being forced to belong to any organization or to make any statements when [individuals] would rather be silent or express different views") [hereinafter Harpaz, *Intellectual Individualism*]; *Shelton v. Tucker*, 364 U.S. 479, 484-90, 81 S. Ct. 247, 250-53 (1960) (public school teacher need not reveal all organizations to which teacher has belonged). Instead, the issue is whether the flag patch requirement "invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control," *West Virginia St. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642, 63 S. Ct. 1178, 1187 (1943).

The threshold issue with respect to Troster's compelled expression claim is whether the flag patch regulation required Troster to engage in expressive conduct. In *Steirer by Steirer v. Bethlehem Area School District*, 987 F.2d 989 (3d Cir. 1993), this court held that, in order for governmentally compelled conduct to be considered "expressive" within the meaning of the

9

First Amendment, the actor <u>must have</u> "[a]n intent to convey a particularized message . . . and in the surrounding circumstances the likelihood [<u>must be</u>] great that the message would be understood by those who viewed it.'" <u>Id.</u> at 995 (quoting with alteration <u>Spence v. Washington</u>, 418 U.S. 405, 410–11, 94 S. Ct. 2727, 2730 (1974) (per curiam) (emphases supplied here). When determining whether conduct is expressive for First Amendment purposes, many other courts and commentators have also interpreted <u>Spence</u> to require both an intent to convey a particularized message and a great likelihood that this message will be understood.

Whether or not this reading of <u>Spence</u> was justified,[0] the Supreme Court just this past term has made clear that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a `particularized message,' cf. <u>Spence v. Washington</u>, 418 U.S. 405, 411, 94 S. Ct. 2727, 2730 (1974) (per curiam), would never reach the unquestionably shielded painting of Jackson

─────────────────

[0]<u>Spence</u>, which has become the touchstone for evaluating whether conduct is expressive for First Amendment purposes, contained no language of necessity. A particularized intent and a likelihood that the message would be understood were present in that case, but the Supreme Court did not say that those were always required for expressive conduct. Rather, after discussing the context in which Spence's protest occurred, the next paragraph of the Court's opinion "noted, further, that [Spence's conduct] was not an act of mindless nihilism." <u>Id.</u> at 410, 94 S. Ct. at 2730. In concluding the paragraph elaborating this observation, the Court simply explained that in Spence's case, "[a]n intent to convey a particularized message was present, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." <u>Id.</u> at 410–11, 94 S. Ct. at 2730.

10

Pollock, music of Arnold Schönberg, or Jabberwocky verse of Lewis Carroll." Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 115 S. Ct. 2338, 2345 (1995) (citation omitted).

In light of Hurley, we believe that Steirer's restrictive test is no longer viable, and that the expressiveness of conduct should be gauged by the language that Spence explicitly articulated as a test: whether, considering "the nature of [the] activity, combined with the factual context and environment in which it was undertaken," we are led to the conclusion that the "activity was sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments . . . ." Spence, 418 U.S. at 409-10, 94 S. Ct. at 2730. This test for determining whether the flag patch requirement compels "expression" from Troster and the other corrections officers is a fact-sensitive, context dependent inquiry. And, Troster's contentions to the contrary notwithstanding, we apply this test not only to symbolic protest cases (see discussion infra) but also to cases alleging compelled expressive conduct. The burden of proof concerning this question is on Troster, and, as we now explain, he has not at this point met his burden under Spence.

b.

We note at the outset of our analysis that this case is unlike most of the Supreme Court's compelled expression cases in that it does not involve actual verbal or written expression. In Barnette, the plaintiff schoolchildren were required to salute the American flag and to recite the pledge of allegiance. 319

11

U.S. at 628-29, 63 S. Ct. at 1180-81. In <u>Wooley v. Maynard</u>, the plaintiffs were required to display the written ideological slogan "Live Free or Die" (New Hampshire's state motto) on their license plates. Even in <u>Abood v. Detroit Board of Education</u>, 431 U.S. 209, 97 S. Ct. 1782 (1977), "a state-required contribution by public school teachers to a labor union's activities was deemed expressive conduct, but only to the extent those union activities involved the expression of political views, the support of political candidates or the advancement of other ideological causes." <u>Steirer</u>, 987 F.2d at 995 (citing <u>Abood</u>, 431 U.S. at 234-36, 97 S. Ct. at 1799-1800).

In contrast to <u>Wooley</u>, <u>Barnette</u>, and <u>Abood</u>, the compulsion to which Troster objects does not involve <u>words</u>, which convey a clear ideological message.[0] Even if other drivers or pedestrians did not think that the Maynards (as opposed to the state) were the <u>source</u> of the message "Live Free or Die," the message <u>was</u> being delivered to such bystanders. Here, in contrast, flag patch observers are presented with a symbol that has various and somewhat imprecise ideas associated with it. Completely aside from the question of misattribution, <u>see, e.g.</u>, <u>Hurley</u>, 115 S. Ct. at 2349 (reserving the question of "the

---

[0] Although other Supreme Court cases involved First Amendment challenges to required statements that were not ideological, <u>see, e.g.</u>, <u>Riley v. National Federation for the Blind</u>, 487 U.S. 781, 795-801, 108 S. Ct. 2667, 2676-80 (1988) (invalidating law requiring professional fundraisers to disclose to donors percentage of contributions turned over to charities), these are more properly viewed as "compelled disclosure" cases, rather than "intellectual individualism" cases like <u>Barnette</u>, <u>Wooley</u>, and <u>Abood</u>. <u>See</u> Harpaz, <u>Intellectual Individualism</u>, 64 TEX. L. REV. at 818-19.

precise significance of the likelihood of misattribution"), the record does not sustain the conclusion that the flag patch on the correctional officers' uniforms will relay any message (ideological or otherwise) to anyone; Troster has presented no evidence that it is likely to function in a communicative fashion.

The conduct required of Troster bears a slightly greater resemblance to that demanded of the plaintiff in Lipp v. Morris, 579 F.2d 834 (3d Cir. 1978), where a high school student successfully challenged the requirement that she "show full respect to the flag while the pledge is being given merely by standing at attention" during the flag salute and recitation of the Pledge of Allegiance. Id. at 835 n.2 (emphases supplied). We also recognize some similarity among the governmental purposes in Barnette, Lipp, and here: in Barnette the state required students to salute the flag and recite the Pledge of Allegiance in order to promote national unity, see 319 U.S. at 631 n.12, 63 S. Ct. at 1182 n.12; in Lipp the state required the plaintiff to stand in order to demonstrate respect for the flag; and here the state required Troster to wear the flag in part to foster loyalty and obedience to his superior officers. Additionally, we may agree with Troster that the flag of the United States is an "obviously expressive element," Br. of Appellant at 26-27 (quoting Steirer, 987 F.2d at 995), and we are fully cognizant that the flag is a unique symbol in our history, one "[p]regnant with expressive content." Texas v. Johnson, 491 U.S. 397, 405, 109 S. Ct. 2533, 2540 (1989).

13

Nevertheless, we think that the gap between Troster's case and Lipp is not one that we may bridge on the present record. As the Supreme Court has admonished, not every action taken with respect to the flag is expressive. Id. Under the circumstances in Lipp, the conduct required of the plaintiff plainly could be seen as a demonstrative act of respect for the flag shown by her (coerced) actions. She was required to stand silently at attention, displaying respect, while her classmates saluted the flag. The government had thus specifically required that she engage in conduct manifesting an attitude. Here, however, it is not apparent from the record that the conduct required of Troster--passively wearing the flag patch--is similarly demonstrative of an attitude or belief.[0] Rather, there is presently no basis for concluding that the requirement that Troster wear the flag patch on his uniform compels him in effect "to profess any statement of belief or to engage in any ceremony of assent to one." Barnette, 319 U.S. at 634, 63 S. Ct. at 1183.[0]

---

[0] We are aware--and if Troster establishes the communicative nature of the flag patch regulation at the final hearing the district court should bear in mind--that in Wooley v. Maynard, the Supreme Court recognized that "[c]ompelling the affirmative act of a flag salute involved a more serious infringement upon personal liberties than the passive act of carrying the state motto on [one's] license plate, but" it considered "the difference [to be] essentially one of degree." 430 U.S. at 715, 97 S. Ct. at 1435 (quoted in Laurie Allen Gallancy, Teachers and the Pledge of Allegiance, 57 U. CHI. L. REV. 929, 939 (1990)).

[0] From the failure of the opinion in Lipp to mention "record evidence that standing during the flag ceremonies conveyed a particularized message," Br. of Appellant at 26, and the approving citation of Lipp in Steirer, 987 F.2d at 994, Troster argues that "the Steirer court could not have enunciated a

14

Troster was one of an entire force of corrections personnel required to wear the flag patch on their uniforms. Evidence at the hearing showed that the uniforms of a large number of organizations have flag patches on them. Troster, however, presented the district court with no evidence (for example, surveys) suggesting that anyone (other than himself) would be likely to view the wearing of the patch as communicative or expressive, or that people who wear such uniforms with such flag patches actually assert anything to anyone. Observers might perhaps <u>infer</u> that the wearer is patriotic, but Troster put on no evidence that observers would likely understand the patch or the wearer to be <u>telling</u> them anything about the wearers' beliefs. <u>Cf.</u> Peter Meijes Tiersma, <u>Nonverbal Communication and the Freedom of "Speech"</u>, 1993 WIS. L. REV. 1525, 1554 & n.122 (citing H.L.A.

principle that required record evidence to support the proposition that the act in question will be understood in a particular fashion, as the District Court required in this case," Br. of Appellant at 26-27. The district court, at the time properly following <u>Steirer</u>, may have searched for too narrow a message in the act of wearing the flag patch. <u>See</u> discussion <u>supra</u> n.10 and accompanying text. However, neither that fact nor the lack of citation to record evidence in the <u>Lipp</u> opinion relieves Troster of the burden of showing that the flag patch regulation compelled him to engage in <u>expressive</u> conduct. The state-coerced conduct at issue in <u>Lipp</u> was a ceremonial gesture--"standing <u>at attention</u>"--occurring in the midst of even more blatant expressions of respect for the flag, all confined to a brief set period each school day. Here, the conduct at issue is the wearing of a small patch on a uniform sleeve throughout the entire work day. We do not agree with Troster that it is "readily inferable," Br. of Appellant at 27, that wearing a flag patch on a corrections officer's uniform "would be seen by most, if not all, observers as showing respect for the flag," <u>id.</u>, and we do not think it too great a burden on Troster's First Amendment interests to require him to come forth with some evidence to support his otherwise bare assertion that the flag patch regulation compels expressive conduct.

Hart, Signs & Words, 2 Phil. Q. 59, 61-62 (1952), discussing whether neighbor shutting windows in preparation for coming storm asserts something thereby, and concluding "no") [hereinafter Tiersma, Nonverbal Communication].

We do not know whether survey data might be available to support Troster's expressive conduct claim. Perhaps Americans (or even an appropriate subset thereof, such as inmates and staff of and visitors to SCI) do in fact perceive people who wear (for example) a Boy Scout, Girl Scout, or police uniform with a flag patch as expressing a patriotic or other ideological message or agreement therewith; perhaps not.

Our duty, however, is to evaluate Troster's likelihood of success on the basis of the evidence presented. And as we discuss below, see infra at 18-21, the Supreme Court has cautioned that the First Amendment should not be held to shield a limitless variety of conduct from governmental regulation. Thus, sympathetic as we may be to Troster's genuine patriotism as well as with his predicament, we cannot accept his suggestion that we hold, as a matter of "common sense" and law, that the mere act of wearing a uniform with a flag patch on it constitutes an expressive or communicative "use" of the flag, cf. Spence, 418 U.S. at 410, 94 S. Ct. at 2730 ("The Court for decades has recognized the communicative connotations of the use of flags.") (emphasis supplied), within the scope of the First Amendment.

c.

In short, Troster has not at this time met his burden. The district court's factual conclusion that "[w]earing the flag

16

patch on a corrections officer's uniform . . . does not convey any agreement or disagreement with all or any of the many things a flag may symbolize, or the Department's view of the flag," op. at 21, App. at 124, is sufficiently supported by the current record. Accordingly, we hold that Troster has not shown a reasonable likelihood of success on the merits with respect to his compelled expression claim, for he has not made the necessary threshold showing that he was (probably) coerced to engage in expressive conduct. Thus, Troster presented the district court with no basis to have granted him a preliminary injunction.

3. VIABILITY OF THE SYMBOLIC PROTEST THEORY IN THESE CIRCUMSTANCES

a.

Troster's alternative theory is that, given the circumstances, his refusal to wear the flag patch required by the Department constituted symbolic expressive conduct protected by the First Amendment.[0] This raises the question whether Troster can present both the compelled expression and symbolic protest claims, that is, whether he has an analytically independent symbolic speech claim? While we do not gainsay that a refusal to comply with a governmental directive may in some cases amount to symbolic protest covered by the First Amendment, this is not one of those cases.

Our narrow conclusion does not ignore the Supreme Court's historical solicitude for free speech claims, its high

---

[0] Technically the First Amendment is inoperative against the states, but its strictures are nonetheless binding on the states via the Fourteenth Amendment. For simplicity, however, this opinion frequently refers only to the First Amendment.

17

regard for a "preferred right[]," see, e.g., Smith v. People, 361 U.S. 147, 169, 80 S. Ct. 215, 227 (Douglas, J., concurring), reaffirmed in several of the Court's recent decisions.[0] But we are satisfied that where, as here, a person seeks only to express opposition to what he or she perceives as a governmental compulsion to engage in speech or expressive conduct, refusing to comply with the very governmental compulsion at issue is not protected as symbolic protest under the First Amendment, for that theory obscures the nature of the interests at stake. Put differently, in circumstances such as these where there is a colorable claim that a governmental compulsion violates the First Amendment's restrictions on governmentally compelled speech, there are not two potentially viable arguments that the Constitution's free speech guarantees protect a person's refusal to comply with the governmental compulsion solely because of opposition to the compulsion. The compulsion to "speak" may be addressed either as a symbolic protest claim, or as a compelled speech claim, but not both. Here, as shall be apparent, the most apt rubric is compelled expression.

Our conclusion that Troster may not raise both a compelled expression claim and a symbolic protest claim grounded solely in objection to compelled speech is animated by the caution with which the Supreme Court has instructed courts to view symbolic conduct claims. The Court has warned that not all

---

[0]In the 1994-1995 term, the Supreme Court ruled on eight free speech claims. "In seven of eight First Amendment-related cases, the party asserting free speech rights prevailed." 64 U.S.L.W. 3055 (Aug. 1, 1995).

18

conduct, even conduct involving the flag of the United States, is "expressive" for purposes of the First Amendment. See Texas v. Johnson, 491 U.S. at 405, 109 S. Ct. at 2540. We do not presume that Troster's refusal to wear the flag patch on his correctional officer's uniform was not expressive as a factual matter. See also infra at 22. Rather, we believe that as a legal matter, the First Amendment does not protect any "right" to disobey a governmental compulsion for the sole purpose of expressing protest against the compulsion on the grounds that it allegedly requires one to engage in speech or expressive conduct.

As Professor Tiersma has explained, a recurring jurisprudential concern "is that the Free Speech Clause may be invoked by anyone who violates a law, claiming to protest against it." Tiersma, Nonverbal Communication, 1993 WIS. L. REV. at 1585. For example, Tiersma recounts that in Cox v. Louisiana the Supreme Court stated that "[o]ne would not be justified in ignoring the familiar red light because this was thought to be a means of social protest." Id. (quoting Cox, 379 U.S. 536, 554, 85 S. Ct. 453, 464 (1965)). Similarly, Justice Scalia has observed that "virtually every law restricts conduct, and virtually any prohibited conduct can be performed for an expressive purpose--if only expressive of the fact that the actor disagrees with the prohibition." Barnes v. Glen Theatre, Inc., 501 U.S. 560, 576, 111 S.Ct. 2456, 2466 (1991) (Scalia, J., concurring) (emphasis supplied) (cited in Tiersma, Nonverbal Communication, 1993 WIS. L. REV. at 1585-86). See also, e.g., State of Washington v. Adams, 479 P.2d 148 (Wash. App. 1971)

19

(rejecting defendant's contention that his using a set net in violation of regulatory salmon fishing statute was "symbolic speech" protected by First Amendment where defendant's only purpose in using the net was to demonstrate the irrationality of the statute prohibiting its use).

As the foregoing discussion suggests, permitting parties to pursue a claim that the First Amendment grants them a right to violate a law solely as a means of publicizing their objection to that law would burden courts with essentially duplicative First Amendment claims. We believe that this problem is particularly acute where individuals violating a governmental compulsion to engage in some behavior merely assert that their violation expresses their belief that the compulsion unconstitutionally requires them to speak or engage in expressive conduct. In such circumstances, both the compelled speech and the putative symbolic protest theories involve the same objection: the individual does not want to be used by government as a mouthpiece to disseminate ideological messages. The symbolic protest theory simply adds a desire to communicate this opposition to others.

The addition of a constitutional symbolic protest claim to a compelled speech claim in this circumstance would only serve to give individuals an additional yet futile bite at the apple.[0]

---

[0]Limited as our powers of imagination may be, we nevertheless cannot conceive of circumstances in which individuals' symbolic protest claims grounded solely in refusal to engage in allegedly coerced expressive conduct could succeed where the root expressive conduct claim failed. If government had an interest sufficient under the First Amendment to justify compelling

20

We do not believe that the Constitution's free speech guarantees countenance such a waste of judicial resources (and of the governmental resources needed to defend such claims). It distorts the constitutional inquiry to shift the focus away from the government's interest in enforcing its expressive-conduct compulsion (despite opposition thereto), to focus instead on the individual's interest in communicating opposition <u>by violating the compulsion</u>, as Troster's dual theory would do. Rather, we believe that, in circumstances such as these, the goal of the individual's conduct is properly characterized with regard to the First Amendment as avoiding the compulsion, rather than expressing disagreement with it.

In sum, symbolic protest claims are not analytically independent of compelled expressive conduct claims in the circumstances that we have described. Courts must therefore determine which theory more accurately captures the essence of the constitutional objection. <u>Cf.</u> <u>Walters v. National Ass'n of Radiation Survivors</u>, 473 U.S. 305, 335, 105 S. Ct. 3180, 3196-97 (1985) (holding that free speech claim essentially duplicating the objection presented in due process claim was of "no independent significance"). In this case, it is the compelled expressive conduct claim. We hold that Troster's conduct was not constitutionally <u>protected</u> as a means of symbolically expressing

individuals to deliver ideological messages despite their opposition, it seems that interest would also be sufficient to justify requiring the individual to deliver the message despite his or her desire to <u>communicate</u> that opposition (to either the message or the compulsion) by refusing to deliver it.

21

opposition, on compelled expression grounds, to the expressive conduct that Troster perceived the flag patch requirement to compel.

b.

This holding does not require us to reject the reasoning of Leonard v. City of Columbus, 705 F.2d 1299 (11th Cir. 1983), upon which Troster relies and which bears some factual similarity to the instant case. In Leonard, a number of police officers were disciplined for appearing in uniform without the flag patch required by departmental regulations. The officers had staged a public rally at which they removed their patches to protest racial discrimination within the police force. The court of appeals held that the officers' conduct amounted to symbolic speech protected by the First Amendment. See id. at 1304.

Troster suggests that this holding at the very least strongly counsels for a ruling in his favor. Leonard, however, is unlike this case in a crucial respect, which we believe is what the district court was driving at when it distinguished Troster's situation from Leonard on the grounds that Troster lacked an "underlying political or patriotic message." Op. at 21 (JA 000124).

In Leonard, although the conduct at issue (the means of the officers' protest) was violation of the flag patch regulation, the object of the protest was not the regulation itself, but rather discrimination by the Department. The reason for the protest was that the Department's alleged racial

22

discrimination violated their rights to equal protection of the laws, not a belief by the officers that the regulation compelled them to engage in expressive conduct in violation of their First Amendment rights. Thus, the officers were engaged in speech for some reason other than protesting being used as a governmental mouthpiece.

As in Leonard, the means of Troster's protest was also violation of a departmental flag patch regulation. In contrast to the officers' protest in Leonard, however, the object of Troster's protest was the regulation itself. The reason for Troster's violation was that the regulation allegedly unconstitutionally compelled him to "speak" by wearing the patch on his uniform. Thus, even if Troster engaged in symbolic speech by violating the flag patch regulation, he did so solely for the purpose of protesting the fact that (in his view) the regulation improperly compelled him to "speak." Hence, it is apparent that the reason for Troster's conduct--namely, his violation of the Department's flag patch regulation, which was the basis for the disciplinary proceedings that he seeks to enjoin permanently--the only point that he was trying to make, was that the regulation violated his First Amendment right not to be a mouthpiece for the government. Troster's symbolic protest claim is thus wholly derivative from his compelled expression claim, which is the essence of his objection to the flag patch regulation, and his

23

free speech objection should accordingly be subject only to compelled expression analysis.[0]

Similarly, the symbolic protest claim in Spence v. Washington, 418 U.S. at 405, 94 S. Ct. at 2727, was not derivative of a compelled expression claim. There, Spence displayed an American flag with peace signs attached in order to protest American violence in Cambodia and at Kent State. After being arrested for violating a law that prohibited improper display of the American flag, his successful claim was that he had a First Amendment right to express his message in that fashion, and that the state could not constitutionally punish him for doing so. Spence's means of expression was a violation of the flag display statute, but the reason for his protest, the message he sought to convey, was not a belief that the flag display statute (a prohibitory measure) compelled him to express

---

[0]This derivative relationship would not be present in the case of a Rosa Parks sitting in the front of a segregated bus. If her actions were analyzed as expressive conduct, her message would not be that the ordinance requiring her to sit at the back of the bus was forcing her to say something. She would not be simply protesting being used as a mouthpiece to deliver some governmental message. Her message would be that the Jim Crow regime was denying her the equal protection of the laws. Thus, even if she were to raise both an equal protection and a symbolic protest claim against the governmental compulsion, her message--conveyed by her violation of the seating ordinance--would be more than simply opposition to being forced by the ordinance to "say" something, and thus she would have only one colorable free speech claim, and symbolic protest (rather than compelled expression) would be the appropriate mode of analysis. While the seating requirement certainly reflected a racist attitude or view about the dignity and social status of black Americans, objection merely to compelled "speech" simply would not have been the only message Rosa Parks sought to convey by her actions.

something that he did not want to say. He was not protesting being forced to act as a mouthpiece for government. Thus, the free speech claim in Spence lacks the duplicative quality of Troster's claim(s), and that case does not help him establish independent viability of his symbolic protest theory.[0]

c.

Our conclusion that Troster cannot press both theories is further supported by the Supreme Court's treatment of the First Amendment claims in Wooley v. Maynard, 430 U.S. at 705, 97 S. Ct. at 1428. The plaintiffs in that case were two Jehovah's Witnesses who objected on political and religious grounds to being required to display New Hampshire's state motto--"Live Free or Die"--that was imprinted on their license plate. After being prosecuted several times for covering the motto, the Maynards challenged the constitutionality of the state law making it a crime to obscure the motto, seeking injunctive relief prohibiting future prosecutions for their covering the motto (usually with

---

[0]Indeed, even a person who burns a flag to protest a statute prohibiting flag burning would not have the same derivative structure to his or her claim. Certainly, the means of the symbolic protest would be a violation of the very law that is the object of the protest. But the reason for the protest would be a belief that the statute unconstitutionally prohibited him or her from speaking; while there may be viewpoint discrimination at work, there is no colorable compelled speech claim there. By prohibiting flag burning, the statute simply does not require the hypothetical banner burner to express anything. So there is just one free speech claim in this scenario: that government is unconstitutionally prohibiting an individual from speaking his or her mind. The flag burner cannot claim that the prohibition forces her to act as a mouthpiece for government, and there is thus no difficulty in letting the individual proceed with a symbolic protest claim.

25

red reflective tape). The Maynards argued both that their act of covering the motto was constitutionally protected because it was necessary for them to avoid a compelled affirmation of belief, and that their act constituted protected symbolic speech not outweighed by sufficient state interests. A three-judge district court declined to "consider whether their First Amendment right to be free from a required affirmation of belief is implicated," concluding instead that the Maynards' affirmative act of covering the motto was constitutionally protected expressive conduct. 406 F. Supp. 1381, 1386 (1976).

On appeal, the Supreme Court took a dramatically different approach to the case. The Court "found it unnecessary to pass on the `symbolic speech' issue," concluding that there were "more appropriate First Amendment grounds" on which to affirm the judgement of the district court. 430 U.S. at 713, 97 S. Ct. at 1434. The Court explained:

> We turn instead to what in our view is the essence of [the Maynards'] objection to the requirement that they display the motto `Live Free or Die' on their automobile license plates. . . . We are thus faced with the question of whether the State may constitutionally require an individual to participate in the dissemination of an ideological message by displaying it on his private property in a manner and for the express purpose that it be observed and read by the public. We hold that the State may not do so.

Id., 97 S. Ct. at 1434-35 (emphasis supplied).

While the Court did not expressly rule that the Maynards had no viable symbolic protest claim, its opinion cast grave doubt on the prospects of that argument. As then-Justice Rehnquist interpreted the majority opinion, "the Court[]

26

implicit[ly] recogni[zed] that there is no protected `symbolic speech' in this case . . . ." Id. at 720, 97 S. Ct. at 1438 (Rehnquist, J., dissenting). Of particular note is the majority's assertion that had the state granted the Maynards' request for special license plates not containing the state motto, the act of displaying them would not be "sufficiently communicative to sustain a claim of symbolic expression." Id. at 713 n.10, 97 S. Ct. at 1434 n.10. This observation alone could be virtually dispositive of Troster's symbolic protest claim.

The Court stated in Wooley that the display of a license plate without the state motto would not amount to constitutionally protected expressive conduct, see id. at 713 n.10, 97 S. Ct. at 1434 n.10, even though most other cars displayed plates with the motto, and even though "New Hampshire citizens [were] generally aware that individuals like the plaintiffs ha[d] been covering the `Live Free or Die' on their license plates in order to express their opposition to the motto's implication that political freedom is the greatest good," see 406 F. Supp. at 1387 n.11. Similarly, since Troster opposes the flag patch regulation because he believes that it coerces him to engage in "speech" (actually, expressive conduct), we believe that his conduct in wearing his correctional officer's uniform without the flag patch, which is required and is in fact worn by all the other guards, would not be protected symbolic speech even if, as he argued before the district court, his contemporaneous and repeated explanations would insure that observers would likely understand the reason for his refusal.

27

In reaching this conclusion, we note that the Supreme Court in Wooley did not contest the evidence and the district court's conclusion, see id., that the people of New Hampshire would most likely understand the significance of the Maynards' acts. Rather, the Court concluded that the act of displaying "expurgated plates" would not "sustain a claim of symbolic expression." 430 U.S. at 713 n.10, 97 S. Ct. at 1434 n.10 (emphasis supplied). The fair implication of this is that certain conduct might be expressive in fact yet not protected by the First Amendment as symbolic expression.

In determining that Troster's conduct falls into this category, we emphasize that the Supreme Court focused on what it termed "the essence" of the Wooley's constitutional claim against the anti-defacement statute. The basis of the Maynards' claim was, constitutionally speaking, not that the law in question prohibited them from "communicat[ing] affirmative opposition to the motto." Id. Rather, the essence of their constitutional objection was that the State was requiring individuals to help disseminate an ideological message by displaying it on their private property. See id., 97 S. Ct. at 1434-35. This is not a symbolic protest issue, but a compelled expression issue, which is how the Court treated it.

Coming full circle, we believe that, as a matter of law, the essence of Troster's objection to the flag patch regulation is not that it limits his ability to protest being used as a governmental mouthpiece. Rather, the essence of his claim is reflected by the stated reason for his protest: Troster

28

believes that the regulation in question unconstitutionally requires him to engage in expressive conduct in violation of his First Amendment rights. This is a colorable compelled expression claim, and that is how we have analyzed his constitutional challenge to the Department's regulation in Part III supra.

In sum, because the message Troster wishes to communicate is simply opposition to the Department's flag patch regulation on compelled expression grounds, and because his preferred method of communicating this message is violation of the regulation, compelled speech analysis is the proper vehicle for his constitutional challenge. Since we have rejected that claim, the order of the district court denying Troster's motion for a preliminary injunction will be affirmed.

The injunction we granted Troster pending this appeal will be vacated. Parties to bear their own costs.