**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MARY FRUDDEN; JON E. FRUDDEN,
*Plaintiffs-Appellants*,

v.

KAYANN PILLING; ROY GOMM
UNIFORM COMMITTEE; HEALTH
MORRISON; LYNN RAUH; WASHOE
COUNTY SCHOOL DISTRICT; DEBRA
BIERSDORFF,
*Defendants-Appellees*.

No. 12-15403

D.C. No.
3:11-cv-00474-
RCJ-VPC

OPINION

Appeal from the United States District Court
for the District of Nevada
Robert Clive Jones, Chief District Judge, Presiding

Argued and Submitted
October 7, 2013—San Francisco, California

Filed February 14, 2014

Before: N. Randy Smith and Jacqueline H. Nguyen, Circuit
Judges, and Gordon J. Quist, Senior District Judge.[*]

Opinion by Judge Nguyen

---

[*] The Honorable Gordon J. Quist, Senior District Judge for the U.S.
District Court for the Western District of Michigan, sitting by designation.

## SUMMARY[**]

### Civil Rights/First Amendment

The panel reversed the district court's Fed. R. Civ. P. 12(b)(6) dismissal for failure to state a claim of an action which alleged, among other things, that a public elementary school's mandatory uniform policy violated the First Amendment.

Plaintiffs asserted that because the school's uniform shirt required the display of the written motto, "Tomorrow's Leaders," the school's uniform policy unconstitutionally compelled speech about leadership. Plaintiffs also argued that the uniform policy contained a content-based exemption for students who wear a "uniform of a nationally recognized youth organization, such as Boy Scouts or Girl Scouts, on regular meeting days."

The panel held that the school policy compelled speech because it mandated the written motto on the uniform shirts. Additionally, the panel held that the exemption for uniforms of nationally recognized youth organizations such as Boy Scouts and Girl Scouts on regular meeting days was content-based. The panel concluded that these provisions implicated First Amendment protections and were subject to strict scrutiny review. Because the district court did not examine whether there was sufficient evidence of the school's countervailing interests—and the record did not contain such evidence—the panel remanded for further proceedings.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Eugene Volokh, Mayer Brown LLP, Los Angeles, California, for Plaintiffs-Appellants.

Randy A. Drake (argued), Chief General Counsel, Washoe County School District, Office of the General Counsel, Reno, Nevada; Michael E. Malloy, Kim G. Rowe and Debra O. Waggoner, Maupin, Cox & LeGoy, Reno, Nevada, for Defendants-Appellees.

Louis M. Bubala III, Armstrong Teasdale LLP, Reno, Nevada; Frank D. LoMonte and Adam Ezra Schulman, Student Press Law Center, Arlington, Virginia, for Amicus Curiae Student Press Law Center.

Nathan W. Kellum, Center for Religious Expression, Memphis, Tennessee; Jonathan Scruggs, Alliance Defense Fund, Memphis, Tennessee, for Amicus Curiae Alliance Defense Fund.

**OPINION**

NGUYEN, Circuit Judge:

This case represents the latest First Amendment challenge to a public school's mandatory student uniform policy. Six years ago, in *Jacobs v. Clark County School District*, 526 F.3d 419 (9th Cir. 2008), we held that a public high school's mandatory uniform policy survives First Amendment scrutiny. Relying on *Jacobs*, the district court here dismissed Mary and Jon Frudden's claim that the mandatory uniform policy at their children's public

elementary school, the Roy Gomm Elementary School ("RGES"), violates the First Amendment.

However, the RGES uniform policy differs in significant respects from the one we found constitutional in *Jacobs*. First, the RGES policy compels speech because it mandates that a written motto, "Tomorrow's Leaders," be displayed on the shirt. *See Wooley v. Maynard*, 430 U.S. 705 (1977). By contrast, the uniforms in *Jacobs* consisted of plain-colored tops and bottoms, without any expressive message. Second, unlike the content-neutral policy in *Jacobs*, the RGES policy contains a content-based exemption for "nationally recognized youth organizations such as Boy Scouts or Girl Scouts on regular meeting days."

These provisions in the RGES uniform policy implicate First Amendment protections and are subject to strict scrutiny review. *Wooley*, 430 U.S. at 715–16. Because the district court did not examine whether there was sufficient evidence of the school's countervailing interests—and the record does not contain such evidence—we reverse and remand.

## BACKGROUND

## A

In May 2011, RGES instituted a mandatory, written uniform policy. The policy was implemented over the vigorous objection of one RGES parent, Mary Frudden, after two-thirds of families voted to approve mandatory school uniforms. Under the policy, students are required to wear red or navy polo-style shirts and tan or khaki bottoms. The RGES uniform shirts have the Roy Gomm logo on the front, which depicts a gopher with the words "Roy Gomm

Elementary School." Critically, the shirts also include a written message above the logo stating "Tomorrow's Leaders." Students are not allowed to alter the uniform in any way.

All students must wear the uniform during school hours and all formal class activities before or after school. If a student does not comply with the uniform policy, RGES notifies the student's parents and the student must change into the approved uniform. Additionally, the non-compliant student will be assigned detention for the first offense, in-school suspension, Saturday school, work crew, or multiple detentions for the second offense, out-of-school suspension for the third offense, and multiple days of out-of-school suspension for any further offenses.

The policy contains certain exemptions, including an exemption for students who wear "a uniform of a nationally recognized youth organization such as Boy Scouts or Girl Scouts on regular meeting days."

**B**

The 2011–2012 academic year at RGES began on August 29, 2011. From August 29 to September 12, 2011, the Frudden children (a fifth-grade boy and a third-grade girl) did not wear the required uniform. The school did not take any disciplinary action and did not ask the children to change into the required uniform.

On September 12, 2011, both children wore American Youth Soccer Organization ("AYSO") uniforms to school. AYSO is a nationally recognized youth organization which regularly meets at least Monday through Friday. The

Frudden children's AYSO uniforms consisted of black shorts and shirts displaying the AYSO logo on the front. Mary Frudden informed school principal KayAnn Pilling that her children were wearing uniforms that fell within the written exemption to the policy.

Pilling told Frudden that the exemption did not apply because the children had neither a meeting nor soccer practice that day. Frudden protested to Debra Biersdorff, the Area Superintendent for the Office of School Performance. Biersdorff agreed with Pilling and said that Pilling could remove a student to compel compliance with the uniform policy. Pilling then called Frudden's son into her office and asked him to change. He agreed and changed into a loaner shirt that Pilling provided. Later, Frudden's daughter likewise changed into the school uniform.

The following day, September 13, 2011, the Frudden children again wore AYSO uniforms to school. Once again, Pilling removed the children from class and asked them to change. Both children agreed to change clothes, although Frudden's son stated that he did not want to do so. The next day, September 14, 2011, Frudden's son wore his RGES uniform shirt inside-out so that the logo was not visible. He turned his shirt right-side-out after he was called into Pilling's office and requested to do so.

## C

On July 6, 2011, the Fruddens filed this action. On October 18, 2011, the Fruddens filed a First Amended Complaint, alleging sixteen claims for relief. This appeal relates only to the second claim for relief, brought pursuant

to 42 U.S.C. § 1983, alleging that the mandatory uniform policy violates the children's First Amendment rights.

The district court granted Defendants' motion to dismiss. The Fruddens timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## STANDARD OF REVIEW

"We review de novo the district court's dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6)." *Zixiang Li v. Kerry*, 710 F.3d 995, 998 (9th Cir. 2013) (citation omitted). "In determining whether dismissal was properly granted, we assume all factual allegations are true and construe them in the light most favorable to the plaintiff." *Cervantes v. United States*, 330 F.3d 1186, 1187 (9th Cir. 2003) (citation omitted).

## DISCUSSION

The Fruddens contend that the RGES uniform policy is subject to strict scrutiny review on two separate grounds. First, they argue that because the uniform shirt must contain a written motto, "Tomorrow's Leaders," the policy unconstitutionally compels speech about leadership. Second, they argue that the uniform policy contains a content-based exemption for "nationally recognized youth organizations, such as Boy Scouts or Girl Scouts, on regular meeting days." We agree.

# I

## A

The "right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all." *Wooley*, 430 U.S. at 714 (citing *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 633–34 (1943)); *see also Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006) (stating that "freedom of speech prohibits the government from telling people what they must say").

The compelled speech doctrine was articulated by the United States Supreme Court in *West Virginia Board of Education v. Barnette*, 319 U.S. 624.  In that case, the defendant board of education required all students "to participate in the salute honoring the Nation represented by the Flag." *Id.* at 626.  While saluting, students were required to recite the Pledge of Allegiance. *Id.* at 627–29.  The salute and pledge were made a "regular part of the program of activities in the public schools." *Id.* at 626 n.2.

The plaintiffs sought to enjoin the board of education from enforcing these rules.  The plaintiffs' children had been expelled from school and their parents had been prosecuted for "causing delinquency." *Id.* at 629–30.  A three-judge, district court panel denied the board of education's motion to dismiss and granted the injunction.  On direct appeal, the Supreme Court affirmed. *Id.* at 642.

The Supreme Court expressed "no doubt that, in connection with the pledges, the flag salute is a form of utterance." *Id.* at 632.  Thus, sustaining the compulsory flag

salute and pledge would mean that "a Bill of Rights which guards the individual's right to speak his own mind, left it open to public authorities to compel him to utter what is not in his mind." *Id.* at 634. In affirming the injunction, the Supreme Court held that "the action of the local authorities in compelling the flag salute and pledge transcends constitutional limitations on their power and invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Id.* at 642.

Thirty years later, relying on *Barnette*, the Supreme Court in *Wooley* struck down a New Hampshire statute requiring motorists to display license plates embossed with the state motto, "Live Free or Die." 430 U.S. at 707, 717. The plaintiffs, who were followers of the Jehovah's Witnesses faith, covered up the motto on their license plates because they considered the motto "repugnant to their moral, religious, and political beliefs." *Id.* at 707–08.

The Supreme Court held that the statute violated the plaintiffs' First Amendment rights because it "forces an individual, as part of his daily life, indeed constantly while his automobile is in public view, to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Id.* at 715. Discussing *Barnette*, the Supreme Court reasoned that "[c]ompelling the affirmative act of a flag salute involved a more serious infringement upon personal liberties than the passive act of carrying the state motto on a license plate, but the difference is essentially one of degree." *Id.*

**B**

**1**

Relying on *Wooley*, the Fruddens argue that the RGES uniform policy violates their children's First Amendment rights because the written motto, "Tomorrow's Leaders," on the shirts compels students to express a particular viewpoint. Because the district court dismissed the Fruddens' compelled speech claim based on *Jacobs*, 526 F.3d 419, *see Frudden v. Pilling*, 842 F. Supp. 2d 1265, 1274 (D. Nev. 2012), we begin with a discussion of that case.

In *Jacobs*, after the defendant school district created a standard dress code for all county students, a number of schools in the district instituted uniform policies. 526 F.3d at 422–23. The policies were similar and required students to wear solid colored bottoms and solid-colored polo, tee, or button-down shirts. *Id.* at 423 & n.5. Some schools allowed uniform shirts to display a school logo as an option, although most did not. *Id.*

A number of students and their parents challenged the uniform policies. One plaintiff, a Jim Bridger Middle School student, argued that his school's policy violated his First Amendment rights because it compelled him to convey a symbolic message, one of support for conformity. *Id.* at 437. We rejected that argument and held that the uniform policies survived constitutional scrutiny. *Id.* at 438.

We reasoned that the uniforms at issue, consisting of plain-colored tops and bottoms "can hardly be compared to wearing the type of 'uniform' contemplated in *Kerik*—i.e., a white hooded gown that clearly identifies its wearer as a

member of the Ku Klux Klan and, presumably, as a subscriber to its views." *Id.* (discussing *Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 206 (2d Cir. 2004)); *see also Troster v. Pa. State Dept. of Corrs.*, 65 F.3d 1086, 1092 (3d Cir. 1995) (stating with respect to an American flag patch on state corrections officers' uniforms that "[o]bservers might perhaps *infer* that the wearer is patriotic, but [the plaintiff] put on no evidence that observers would likely understand the patch or the wearer to be *telling* them anything about the wearers' beliefs" (emphasis in original)). Because the uniforms in *Jacobs* involved no "written or verbal expression of any kind," the plaintiff's school did not force him to "communicate any message whatsoever—much less one expressing support for conformity or community affiliation—simply by requiring him to wear the solid-colored tops and bottoms mandated by its uniform policy." 526 F.3d at 438.

In contrast to the uniform policies in *Jacobs*, the RGES policy mandates *written expression*, a message on the shirts above the school logo stating "Tomorrow's Leaders." The Fruddens argue that this written motto conveys two viewpoints—that leadership should be celebrated (or at least valued above being a follower); and that RGES is, in fact, likely to produce "[t]omorrow's leaders."[1]

Relying on *Jacobs*, the district court here concluded that "[t]here is no meaningful risk that a bystander would think

---

[1] The written motto also differentiates this case from *Kerik*, 356 F.3d 197, in which the clothing itself was expressive, even though there may not have been any written message thereon. *See id.* at 206 ("[T]he regalia of the American Knights, including the robe, mask, and hood, are expressive . . . .").

any of the hundreds of identically dressed young children on the grounds of an elementary school individually chose the motto and/or mascot appearing on their uniforms." 842 F. Supp. 2d at 1274 (citing *Jacobs*, 526 F.3d at 437–38). However, that reasoning is inconsistent with *Wooley*. In *Wooley*, then-Justice Rehnquist dissented on a similar basis. Justice Rehnquist argued that there was "no affirmation of belief involved in the display of state license tags upon the private automobiles involved" in that case. 430 U.S. at 722 (Rehnquist, J., dissenting). But as Justice Rehnquist recognized, this is not the test. "[T]he test is whether the individual is forced 'to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable.'" *Id.* at 721 (Rehnquist, J., dissenting) (quoting *id.* at 715 (majority opinion)).

RGES's inclusion of the motto "Tomorrow's Leaders" on its uniform shirts is not meaningfully distinguishable from the State of New Hampshire's inclusion of the motto "Live Free or Die" on its license plates. Practically speaking, RGES compels its students "to be an instrument" for displaying the RGES motto. Had the RGES uniforms consisted of plain-colored tops and bottoms, as in *Jacobs*, RGES would have steered clear of any First Amendment concerns. However, by mandating the written motto on the uniform shirts, the RGES policy compels speech under *Wooley*.[2]

---

[2] In light of our holding, we do not address whether the Fruddens can state a compelled speech claim based, without more, on the school logo (i.e., the "stylized gopher" with the words "Roy Gomm Elementary School"). *See Jacobs*, 526 F.3d at 433 ("While the [defendant school district] could have steered far clear of the First Amendment's boundaries by foregoing the logo provision entirely, we nevertheless conclude that allowing students' otherwise solid-colored clothing to contain a school logo—an item expressing little, if any, genuine communicative

**2**

RGES's arguments to the contrary are unavailing. First, that RGES did not discipline the Fruddens' children is irrelevant to their First Amendment challenge. In *Wooley*, the fact that the plaintiff already had "sustained convictions" and "served a sentence of imprisonment for his prior offenses" was of little significance because "the relief sought [wa]s wholly prospective." 430 U.S. at 711. More generally, preenforcement challenges to government-imposed speech restrictions are not extraordinary. *See, e.g.*, *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2733 (2011) (preenforcement challenge to law prohibiting sale or rental of "violent video games").

Second, while Defendants are correct that *Wooley* did not involve compelled speech in the public elementary school context, *Barnette* did. Moreover, while the First Amendment rights of public school students "are not automatically coextensive with the rights of adults in other settings" and must be "applied in light of the special characteristics of the school environment," elementary school students "do not shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (internal quotation marks omitted); *see also Barnette*, 319 U.S. at 624-26.[3]

---

message—does not convert a content-neutral school uniform policy into a content-based one."). We note, however, that inclusion of the school logos in *Jacobs* was optional.

[3] On remand, the elementary school context may be relevant in weighing RGES's interest in including the motto on the uniform shirt.

Third, whether the RGES students had any alternative means to disclaim the school motto is not significant. Illustratively, in *Wooley*, the plaintiffs could have "place[d] on their bumper a conspicuous bumper sticker explaining in no uncertain terms that they do not profess the motto 'Live Free or Die' and that they violently disagree with the connotations of that motto." 430 U.S. at 722 (Rehnquist, J., dissenting). Likewise, in *Barnette*, the compulsory salute and recitation constituted compelled speech even though students could have "simulate[d] assent by words without belief and by a gesture barren of meaning." 319 U.S. at 633.

Finally, we do not believe the First Amendment analysis turns on an examination of the ideological message (or lack thereof) of "Tomorrow's Leaders." As the D.C. Circuit recently explained, "[t]he right against compelled speech is not, and cannot be, restricted to ideological messages." *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 957 (D.C. Cir. 2013); *accord, e.g.*, *Forum for Academic & Institutional Rights, Inc.*, 547 U.S. at 62 ("[C]ompelled statements of fact . . . , like compelled statements of opinion, are subject to First Amendment scrutiny."); *Barnette*, 319 U.S. at 634 ("Whether the First Amendment to the Constitution will permit officials to order observance of ritual of this nature does not depend upon whether as a voluntary exercise we would think it to be good, bad or merely innocuous."); *Cressman v. Thompson*, 719 F.3d 1139, 1152 (10th Cir. 2013) ("[T]he Supreme Court's case law suggests that ideological speech is not the only form of forbidden compelled speech." (citing cases)).

## II

Next, we turn to the Fruddens' argument that the policy is not content-neutral because it contains an exemption for

uniforms of "nationally recognized youth organizations such as Boy Scouts and Girl Scouts on regular meeting days." According to the Fruddens, the AYSO is a nationally recognized youth organization which regularly meets at least Monday through Friday.

In considering the exemption at issue, we find *Carey v. Brown*, 447 U.S. 455 (1980), instructive. In *Carey*, the Supreme Court struck down a statute that generally prohibited picketing of residences and dwellings, but exempted "'the peaceful picketing of a place of employment involved in a labor dispute.'" *Id.* at 457. The statute plainly "accords preferential treatment to the expression of views on one particular subject; information about labor disputes may be freely disseminated, but discussion of all other issues is restricted." *Id.* at 461. The Supreme Court held that the statute was not content-neutral because "[t]he permissibility of residential picketing under [the statute] is thus dependent solely on the nature of the message being conveyed." *Id.*; *see also Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 98–99 (1972) ("[J]ustifications for selective exclusions from a public forum must be carefully scrutinized. Because picketing plainly involves expressive conduct within the protection of the First Amendment, discriminations among pickets must be tailored to serve a substantial governmental interest." (citations omitted)).

Similarly, the language of the RGES policy's exemption favors the uniforms of certain youth organizations over all other clothing that the students may choose to wear in the absence of the exemption. Further, the exemption explicitly favors the uniforms of the Boy Scouts and Girl Scouts over all other uniforms (e.g., those of the AYSO), and favors the uniforms of "nationally recognized" youth organizations over

those of locally or regionally recognized youth organizations. Indeed, requiring national recognition implicitly favors the uniforms of youth organizations that enjoy widespread acceptance – although what degree of acceptance would qualify a youth organization as "nationally recognized" is unclear. The determination concerning whether a given youth organization is "nationally recognized" – to some undefined degree – "cannot help but be based on the content" of the organization and its uniform "and the message it[s uniform] delivers." *See Regan v. Time, Inc.*, 468 U.S. 641, 648 (1984) (ruling that exception to statute prohibiting photographic reproductions of currency "presented constitutional problems of its own"). Therefore, we conclude that the RGES policy's "exemption indicates a content-specific distinction between favoring certain clothing-related 'speech.'" *See Jacobs*, 373 F. Supp. 2d at 1182.[4]

### III

Having identified the Fruddens' "interests as implicating First Amendment protections does not end our inquiry however." *See Wooley*, 430 U.S. at 715**.**

Because RGES compels students to endorse a particular viewpoint, strict scrutiny applies – that is, inclusion of the written motto on the RGES uniform shirts must be "'a

---

[4] Significantly, the uniform policy in *Jacobs* included a nearly identical exemption for "nationally recognized youth organizations such as the Boy Scouts or the Girl Scouts" when "those organizations have their meeting days." *See* 526 F.3d at 424 n.12; *Jacobs*, 373 F. Supp. 2d at 1166. After the district court in that case expressed "strong reservations" that the exemption was not content-neutral, the defendant school district voluntarily eliminated the exemption from the policy. 526 F.3d at 524 & n.12.

narrowly tailored means of serving a compelling state interest.'" *Rounds v. Or. State Bd. of Higher Educ.*, 166 F.3d 1032, 1038 n.4 (9th Cir. 1999) (quoting *Pac. Gas & Elec. Co. v. Public Utils. Comm'n*, 475 U.S. 1, 19 (1986)); *see Wooley*, 430 U.S. at 716 ("We must also determine whether the State's countervailing interest is sufficiently compelling to justify requiring appellees to display the state motto on their license plates." (citing *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968))).

Likewise, it is axiomatic that we "apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994) (citations omitted).[5] Thus, the RGES policy's content-based exemption also must survive strict scrutiny review.

Because the district court granted Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), RGES was not required to make any showing regarding its justifications for including the written motto or the exemption in the policy. Likewise, the Fruddens were not given the opportunity to produce any countervailing evidence. Nor is the record adequately developed on these issues. Thus, we conclude that a remand is necessary. Whether Defendants' "countervailing interest is sufficiently compelling to justify requiring" the written motto and the exemption is a question

---

[5] "In contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny, because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Id.* (citation omitted).

for summary judgment or trial.[6]  *See Wooley*, 430 U.S. at 715–16; *Jacobs*, 526 F.3d at 425 (noting that the district court construed the motion to dismiss as one for summary judgment and allowed the parties to supplement the record accordingly).

## CONCLUSION

We hold that the RGES policy compels speech because it mandates the written motto, "Tomorrow's Leaders," on the uniform shirts.  Further, the exemption for uniforms of "nationally recognized youth organizations such as Boy Scouts and Girl Scouts on regular meeting days" is content-based.  For these reasons, we conclude that strict scrutiny review applies.

We reverse and remand for further proceedings consistent with this opinion.

## REVERSED and REMANDED.

---

[6] We do not suggest that the entire policy must fall if RGES's justifications are insufficient.  For example, under *Jacobs*, the RGES policy clearly would survive constitutional scrutiny if the uniforms consist of plain-colored tops and bottoms.  Thus, whether the written motto or the exemption passes constitutional muster are separate inquiries.