FILED
**United States Court of Appeals**
**Tenth Circuit**

**June 12, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KEITH CRESSMAN,

     Plaintiff - Appellant,

v.

MICHAEL C. THOMPSON, in his official
capacity as Secretary of Safety and
Security and as the Commissioner of
Public Safety for the State of Oklahoma, et
al.,

     Defendants - Appellees.

No. 12-6151
(D.C. No. 5:11-CV-01290-HE)

_____

**ORDER**
_____

Before **KELLY**, **HOLLOWAY**, and **MATHESON**, Circuit Judges.
_____

Due to a clerical error, the Opinion issued in this matter yesterday did not include

a planned dissent. Consequently, the decision filed is vacated, and the clerk is instructed

to reissue the Opinion, to include the dissent, and to reissue the judgment with today's

date. A copy of the Opinion with the dissent is attached to this order.


        Entered for the Court


        ELISABETH A. SHUMAKER, Clerk

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 12, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

KEITH CRESSMAN,

      Plaintiff - Appellant,

v.

MICHAEL C. THOMPSON, in his official capacity as Secretary of Safety and Security and as the Commissioner of Public Safety for the State of Oklahoma; PAULA ALLEN, individually and in her official capacity as Licensing Services Hearing Officer for the Oklahoma Department of Public Safety; THOMAS KEMP, JR., in his official capacity as Chairman of the Oklahoma Tax Commission; JERRY JOHNSON, in his official capacity as Vice Chairman of the Oklahoma Tax Commission; DAWN CASH, in her official capacity as Secretary Member of the Oklahoma Tax Commission; KERRY PETTINGILL, in his official capacity as Chief of the Oklahoma Highway Patrol,

      Defendants - Appellees.

No. 12-6151

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. 5:11-CV-01290-HE)**

Nathan W. Kellum, Center for Religious Expression, Memphis, Tennessee (Jonathan A. Scruggs, Alliance Defending Freedom, Memphis, Tennessee, with him on the briefs), appearing for Appellant.

Kevin McClure, Assistant Attorney General, Office of Attorney General, Litigation Division, Oklahoma City, Oklahoma (Larry Patton, Senior Assistant General Counsel, and Meredith W. Wolfe, Assistant General Counsel, Oklahoma Tax Commission, Oklahoma City, Oklahoma, with him on the brief), appearing for Appellees.

---

Before **KELLY, HOLLOWAY,** and **MATHESON,** Circuit Judges.

---

**MATHESON**, Circuit Judge.

---

This appeal concerns an image stamped on the standard Oklahoma license plate of a Native American shooting an arrow toward the sky. Appellant Keith Cressman objects to the image as a form of speech and wishes not to display it on his personal vehicles. But Oklahoma law imposes sanctions for covering up the image, and the state charges fees for specialty license plates without it—fees that Mr. Cressman does not want to pay. Because he must either display the image or pay additional fees, he argues that the state is compelling him to speak in violation of his First Amendment rights.

Mr. Cressman sued several state officials for violation of his civil rights. Concluding that he failed to state a claim upon which relief could be granted, the district court dismissed his First Amended Complaint ("complaint") and denied his request for a preliminary injunction.

This case comes to us from the district court's dismissal of Mr. Cressman's complaint. Like the district court, our task is to determine, assuming Mr. Cressman can prove his allegations, whether he has a claim as a matter of law. This stage is therefore a

test of his complaint, not of his evidence. In other words, if Mr. Cressman can prove the facts alleged in his complaint, is he entitled to relief?

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, and based upon Mr. Cressman's allegations and the continuing vitality of the Supreme Court's decision in *Wooley v. Maynard*, 430 U.S. 705 (1977), we reverse and remand.

## I. BACKGROUND

At the motion-to-dismiss stage, "[w]e must accept as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." *Rosenfield v. HSBC Bank, USA*, 681 F.3d 1172, 1178 (10th Cir. 2012) (quotations omitted). We recite the facts as alleged in Mr. Cressman's complaint and in the light most favorable to him.

### A. *Factual History*

### 1. Mr. Cressman's Beliefs and Oklahoma's Standard License Plate

Mr. Cressman is a citizen of Oklahoma who "adheres to historic Christian beliefs." Appx. at 188. He "believes there is only one true God" and that it is "a sin . . . to honor or acknowledge anyone or anything as God besides the one true God." *Id.* He refrains from adopting or endorsing any message he believes might imply his approval of contrary beliefs, such as that God and nature are one, that other deities exist, or that "animals, plants, rocks, and other natural phenomena" have souls or spirits. *Id.* at 189.

In August 2008, Mr. Cressman learned that the State of Oklahoma had redesigned its standard vehicle license plate and intended to introduce it in January 2009.[1] The redesigned plate included an image depicting a sculpture of a Native American shooting an arrow toward the sky. Upon seeing the image, Mr. Cressman "discerned that [it] depicted and communicated Native American religious beliefs in contradiction to his own Christian religious beliefs." *Id.* at 190.

More specifically, he learned that the image depicted a sculpture by artist Allan Houser titled "Sacred Rain Arrow." According to the complaint, the sculpture is based on a Native American legend in which a warrior convinced a medicine man to bless his bow and arrows during a time of drought. The warrior shot an arrow into the sky, hoping the "spirit world" or "rain god" would answer the people's prayers for rain. *Id.*[2]

In Mr. Cressman's view, the image "retells the story of a Native American who believes in sacred objects[,] in multiple deities and in the divinity of nature[,] and in the ability of humans to use sacred objects to convince gods to alter nature." *Id.* at 191. He alleges that viewers of the image "will understand that [it] communicates ideas and

---

[1] We include a copy of the license plate at the end of this opinion.

[2] As previously noted, at this stage we accept Mr. Cressman's factual allegations as true. But we also note that the Defendants, without expressly admitting that the image is based on the "Sacred Rain Arrow" sculpture, state that the license plate image "is a modified version of the sculpture that sits outside the Gilcrease Museum in Tulsa, Oklahoma." Aplee. Br. at 7. They further refer this court to a web site featuring a picture of the museum sculpture. The web site confirms it is the "Sacred Rain Arrow" sculpture. *See id.* (citing to http://gilcrease.utulsa.edu/Learn/Speaking-of-Gilcrease/The-Gardens-at-Gilcrease).

messages about Oklahoma, about Native American culture and practices, and about Oklahoma's connection to these Native American practices." *Id.* at 190. The "message, connotation, and purpose of the 'Sacred Rain Arrow' sculpture—and the license plate with the image of that sculpture—[are] antithetical to [Mr.] Cressman's sincerely-held religious beliefs." *Id.* at 191. He does not want to display the image on his vehicles and would rather "remain silent with respect to images, messages, and practices that he cannot endorse or accept." *Id.*

2. **Efforts to Avoid Displaying the Image**

To avoid displaying the image, Mr. Cressman purchased a specialty license plate, which cost $37 more than the standard plate and had a $35 renewal fee. He then purchased a cheaper specialty license plate, which cost $18 more than the standard plate, plus $16.50 for renewal. Eventually, he decided he no longer wanted to pay additional fees for a specialty license plate. Instead, he wanted to cover up the image, without obscuring letters, tags, or identifying markers on the license plate.

Mr. Cressman visited the Motor Vehicle Division of the Oklahoma Tax Commission in Oklahoma City. He asked a clerk whether he could legally cover up the image on the license plate. The clerk informed him he probably would be ticketed if he did so and suggested that Mr. Cressman talk to an "enforcing officer" at the Department of Public Safety. *Id.* at 192.

Mr. Cressman then spoke with Paula Allen, "the official in charge of interpreting policies for the Department of Public Safety." *Id.* He explained his objection to the

license plate image and asked her whether he could cover it up. Ms. Allen said that Okla. Stat. tit. 47, § 4-107 ("Section 4-107") prohibited him from doing so. She confirmed this with an Oklahoma Highway Patrol official.

After this meeting, Mr. Cressman reviewed Section 4-107, as well as Okla. Stat. tit. 47, § 1113 ("Section 1113").[3] Section 1113(A)(2) requires that "[t]he license plate, decal and all letters and numbers shall be clearly visible at all times." It is a violation of Section 1113 to operate "a vehicle in [Oklahoma] . . . upon which the license plate is covered, overlaid or otherwise screened with any material, whether such material be clear, translucent, tinted or opaque." *Id.* § 1113(A)(2). Mr. Cressman further determined that a violation of Section 1113 is a misdemeanor with a fine of up to $300. *See id.* § 1151(I).

After his research, Mr. Cressman determined that Ms. Allen was correct that covering up the image would be illegal. Accordingly, he pays additional fees to display specialty license plates on two vehicles registered in Oklahoma. He alleges this situation

---

[3] We doubt that Section 4-107 prohibits Mr. Cressman from covering up the image. The only portion of Section 4-107 that is relevant to license plates is subsection (d), which states: "A person who removes a license plate from a vehicle or affixes to a vehicle a license plate not authorized by law for use on said vehicle with intent to conceal or misrepresent the identity of the vehicle or its owner shall, upon conviction, be guilty of a misdemeanor." Okla. Stat. tit. 22, § 4-107(d). Mr. Cressman did not ask Ms. Allen whether he could remove his license plate to conceal the identity of his vehicle, so Section 4-107 does not seem to apply.

Accordingly, Mr. Cressman focuses on Section 1113. We do the same throughout this opinion.

is "intolerable . . . because he does not want to incur extra expense to avoid expressing a message contrary to his religious beliefs."  Appx. at 195.

In March 2010, he sent letters to the Oklahoma Attorney General and Assistant Attorney General, the Chief of the Oklahoma Highway Patrol, and the Secretary of Safety and Security/Commissioner of Public Safety.  The letters explained his objections to the license plate image and asserted that forcing him to display the image violated his constitutional rights.  Mr. Cressman requested that these officials provide a remedy within three weeks; he received no responses.

## B.  *Procedural History*

Mr. Cressman filed a 42 U.S.C. § 1983 civil rights lawsuit in the United States District Court for the Western District of Oklahoma.  The amended complaint names six defendants:  Ms. Allen, in her individual and official capacity as a Licensing Services Hearing Officer; Michael C. Thompson, in his official capacity as the Secretary of Safety and Security/Commissioner of Public Safety; Kerry Pettingill, in his official capacity as the Chief of the Oklahoma Highway Patrol; and Thomas Kemp Jr., Jerry Johnson, and Dawn Cash, in their official capacities as members of the Oklahoma Tax Commission.[4]

Mr. Cressman alleged violations of his rights to freedom of speech, due process, and the free exercise of religion under the First and Fourteenth Amendments to the

---

[4] We refer to Defendants Allen, Thompson, and Pettingill collectively as the "Public Safety Defendants," and to the other defendants as the "Tax Commission Defendants."  We refer to all six collectively as the "Defendants."

United States Constitution.[5]  In conjunction with his complaint, he filed a motion for a preliminary injunction to enjoin the Defendants from enforcing Section 1113. Alternatively, he sought to compel the Defendants to provide him with specialty license plates at no additional cost.

The Public Safety Defendants moved to dismiss the complaint.  Their motion argued, *inter alia*, that Mr. Cressman failed to state a claim upon which relief could be granted and that he lacked Article III standing.  The Tax Commission Defendants separately moved to dismiss the complaint.

The district court dismissed Mr. Cressman's federal constitutional claims.[6] Although it determined Mr. Cressman had Article III standing, the court ruled that he failed to state a "compelled speech" claim under the First Amendment.  This failure, according to the district court, was fatal to the rest of his federal claims, as well as his motion for a preliminary injunction.

On May 16, 2012, the district court entered judgment dismissing Mr. Cressman's federal constitutional claims with prejudice as to all the Defendants.  Mr. Cressman filed a timely notice of appeal.

## II.  DISCUSSION

---

[5] Mr. Cressman also asserted a violation of the Oklahoma Religious Freedom Act, Okla. Stat. tit. 51, § 251 et seq.

[6] The court declined to exercise supplemental jurisdiction over the Oklahoma Religious Freedom Act claim and dismissed it without prejudice.

Two issues are before us on appeal. First, the Defendants assert that Mr.

Cressman lacks Article III standing to sue them in their official capacities. Our review of

this issue is de novo. *See Roe No. 2 v. Ogden*, 253 F.3d 1225, 1228 (10th Cir. 2001).

Second, Mr. Cressman argues that the district court erred in dismissing his complaint for

failure to state a First Amendment compelled speech claim. *See* Fed. R. Civ. P. 12(b)(6).

We review a Rule 12(b)(6) dismissal de novo. *Khalik v. United Air Lines*, 671 F.3d

1188, 1190 (10th Cir. 2012).[7]

We start with standing because it is a jurisdictional issue. *See Sinochem Int'l Co.

v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007); *Wilson v. Glenwood

Intermountain Props., Inc.*, 98 F.3d 590, 592-93 (10th Cir. 1996).

## A. *Article III Standing*

The Defendants assert that Mr. Cressman lacks Article III standing to sue them in

their official capacities. Mr. Cressman, "as the party seeking to invoke federal

jurisdiction, bear[s] the burden of establishing standing." *Petrella v. Brownback*, 697

F.3d 1285, 1292 (10th Cir. 2012). "When evaluating a plaintiff's standing at [the motion

to dismiss] stage, both the trial and reviewing courts must accept as true all material

_____

[7] The district court also denied Mr. Cressman's request for a preliminary injunction. This ruling did not rely on facts outside the complaint and turned on Mr. Cressman's failure to state a compelled speech claim. Accordingly, the district court's denial of his motion for a preliminary injunction rests on a legal determination, which we review de novo. *See Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003).

allegations of the complaint, and must construe the complaint in favor of the complaining party." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006) (en banc) (quotations omitted). At this stage, the plaintiff's "burden in establishing standing is lightened considerably." *Petrella*, 697 F.3d at 1292.

Mr. Cressman's "appeal cannot proceed on the merits in the absence of . . . [a] case or controversy" under Article III of the U.S. Constitution. *Habecker v. Town of Estes Park, Colo.*, 518 F.3d 1217, 1223 (10th Cir. 2008). "To establish Article III standing, a plaintiff must establish (1) that he or she has 'suffered an injury in fact;' (2) that the injury is 'fairly traceable to the challenged action of the defendant;' and, (3) that it is 'likely' that 'the injury will be redressed by a favorable decision.'" *Awad v. Ziriax*, 670 F.3d 1111, 1120 (10th Cir. 2012) (quoting *Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1442 (2011)). "We refer to these three familiar requirements as injury in fact, causation, and redressability." *Habecker*, 518 F.3d at 1224.

1. **Injury in Fact**

"First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted) (quotations omitted).

Mr. Cressman alleges he does not want to "endorse and express a message on his car that is contrary to and diametrically opposed to his sincerely-held religious beliefs." Appx. at 197. He faces three choices. First, he could obtain standard license plates and

cover up the image, in violation of Section 1113. He has been informed, and the Defendants have never disputed, that he faces a threat of prosecution and criminal penalties if he does so. This credible threat of prosecution is sufficient to support an injury in fact. *See Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003) ("[A] plaintiff generally has standing if he or she alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder." (quotations omitted)).

Second, he could display the image, to which he objects on religious grounds. He argues that this constitutes compelled speech and is an injury in fact. We agree. *See Jacobs v. Clark Cnty. Sch. Dist.*, 526 F.3d 419, 426-27 (9th Cir. 2008) (stating that compelled speech in violation of First Amendment is an injury in fact); *see also Wooley*, 430 U.S. at 715 (stating that compelled speech "invades the sphere of intellect and spirit which it is the purpose of the First Amendment" to protect (quotations omitted)).

Third, Mr. Cressman now purchases specialty license plates to avoid displaying the image on Oklahoma's standard plate. The additional cost of the specialty license plates is a concrete, actual monetary injury that Mr. Cressman alleges he incurs to avoid prosecution and engaging in unwanted speech. *See Umbehr v. McClure*, 44 F.3d 876, 879 (10th Cir. 1995).

These alleged injuries are sufficient to support the first element of Article III standing.

2. **Causation**

Mr. Cressman must show there is "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action *of the defendant*, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (alterations omitted) (emphasis added) (quotations omitted). "It is well-established that when a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to *possess authority to enforce the complained-of provision*." *Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007) (emphasis added).

Mr. Cressman challenges Section 1113 and has alleged that Mr. Thompson and Mr. Pettingill are charged with enforcing the provision. At oral argument, counsel for the Defendants conceded that Mr. Thompson and Mr. Pettingill are charged with enforcing Title 47, which contains Section 1113. Thus, they "possess authority to enforce the complained-of provision," *id.*, and Mr. Cressman's injuries are fairly traceable to them.

Mr. Cressman alleges the Tax Commission Defendants are charged with enforcing the challenged statute. On appeal, he notes that Section 1113 grants the Tax Commission Defendants the authority to control how motorists display their license plates. *See* Okla. Stat. tit. 47, § 1113(A)(2) ("The Tax Commission may . . . change and direct the manner, place and location of display of any vehicle license plate when such action is deemed in the public interest."). And, at oral argument, counsel for the Defendants conceded that if Mr. Cressman seeks a specialty license plate at no extra cost, he should sue the Tax

Commission Defendants. We conclude that Mr. Cressman has shown the Tax Commission Defendants have relevant enforcement powers and that his injuries are fairly traceable to them.

This leaves only Ms. Allen. Mr. Cressman alleges she is a Licensing Services Hearing Officer who is "responsible for interpreting and administering" the challenged statute. Appx. at 188. However, the authority to interpret and administer a statute is not the same as the authority to *enforce* a statute. Apparently recognizing this distinction, Mr. Cressman alleged in his amended complaint that all other Defendants have enforcement authority, but made no such allegation about Ms. Allen.

On appeal, however, Mr. Cressman insists that Ms. Allen has enforcement authority. He notes that the amended complaint alleges that when he visited the Oklahoma Tax Commission, Motor Vehicle Division, a clerk told him to check with a Department of Public Safety enforcing officer about the legality of covering up the image. He then went to the Department of Public Safety and met with Ms. Allen.

But a clerk's suggestion to meet with an enforcing officer does not render Ms. Allen capable of enforcing Section 1113. Further, Mr. Cressman's complaint belies his suggestion that Ms. Allen has enforcement authority. It alleges that he spoke with Ms. Allen, "the official in charge of *interpreting policies* for the Department of Public Safety." *Id.* at 192.

Mr. Cressman has not shown that Ms. Allen in her official capacity has the "authority to enforce the complained-of provision," *Bronson*, 500 F.3d at 1110, and thus

-13-

has not met his pleading burden of demonstrating that his injuries are fairly traceable to

her actions.[8]

---

[8] Whether the Defendants have enforcement authority is related to whether, under *Ex parte Young*, 209 U.S. 123 (1908), they are proper state officials for suit. The Defendants raise *Ex parte Young* as part of their Article III standing analysis, although *Ex parte Young* concerns sovereign immunity.

Under *Ex parte Young*, a plaintiff may avoid the Eleventh Amendment's prohibition on suits against states in federal court by seeking to enjoin a state official from enforcing an unconstitutional statute. *Id.* at 157. The plaintiff must be "(1) suing state officials rather than the state itself, (2) alleging an ongoing violation of federal law, and (3) seeking prospective relief." *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1167 (10th Cir. 2012). In addition, the named state official "must have *some connection with the enforcement*" of the challenged statute. *Ex parte Young*, 209 U.S. at 157 (emphasis added). This language does not require that the state official "have a 'special connection' to the unconstitutional act or conduct," but rather that the state official "have a particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that duty." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007) (quoting *Ex parte Young*, 209 U.S. at 157).

As the Ninth Circuit has explained, there is a common thread between Article III standing analysis and *Ex parte Young* analysis:

> Whether [state] officials are, in their official capacities, proper defendants in [a] suit is really the common denominator of two separate inquiries: first, whether there is the requisite causal connection between their responsibilities and any injury that the plaintiffs might suffer, such that relief against the defendants would provide redress [i.e., Article III standing]; and second, whether . . . jurisdiction over the defendants is proper under the doctrine of *Ex parte Young*, which requires "some connection" between a named state officer and enforcement of a challenged state law.

*Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004).

As discussed above, Mr. Cressman has shown that all Defendants, except for Ms. Allen, have a particular duty to enforce the challenged statute and thus are proper state officials for suit under *Ex parte Young*.

-14-

## 3. **Redressability**

Finally, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (quotations omitted).

Mr. Cressman seeks alternative forms of injunctive relief. He requests that Section 1113 not be enforced against him. At oral argument, counsel for the Defendants conceded that Mr. Thompson and Mr. Pettingill could provide this relief. Alternatively, Mr. Cressman requests specialty license plates at no extra cost. Counsel for the Defendants conceded that the Tax Commission Defendants could provide this relief.

Accordingly, because a favorable decision could give Mr. Cressman his requested injunctive relief from Mr. Thompson, Mr. Pettingill, and the Tax Commission Defendants, he has demonstrated redressability.

As to Ms. Allen, Mr. Cressman has provided no basis to conclude that the district court could order her to do anything in her official capacity to redress his alleged injuries.

\* \* \*

In sum, Mr. Cressman has demonstrated he has Article III standing to sue all Defendants in their official capacities, except for Ms. Allen.[9]

### B. *First Amendment Compelled Speech Claim*

The main issue on appeal is whether the district court erred in dismissing Mr. Cressman's First Amendment compelled speech claim under Fed. R. Civ. P. 12(b)(6).

---

[9] We express no opinion regarding Mr. Cressman's claims against Ms. Allen in her individual capacity.

-15-

Our discussion of this issue has three parts.  First, we address the Supreme Court's treatment of symbolic speech and compelled speech under the First Amendment. Second, we analyze whether Mr. Cressman's complaint states a plausible compelled symbolic speech claim.  Finally, we address the Defendants' argument that the image on the license plate is government speech that does not implicate the First Amendment.

1. **Legal Background**

"The First Amendment, as applied to state and local governments through the Fourteenth Amendment, provides that state actors 'shall make no law . . . abridging the freedom of speech.'"  *Hawkins v. City & Cnty. of Denver*, 170 F.3d 1281, 1286 (10th Cir. 1999) (quoting U.S. Const. amend. I).  This protection is multifaceted.  "Just as the First Amendment may prevent the government from prohibiting speech, [it] may prevent the government from compelling individuals to express certain views."  *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001).  Thus, "one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say."  *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) (quotations omitted).

The Supreme Court's decision in *Wooley v. Maynard*, 430 U.S. 705 (1977), reflects this principle.  In *Wooley*, the Court held unconstitutional a New Hampshire requirement that the plaintiffs display the state motto, "Live Free or Die," on their vehicle license plate.  430 U.S. at 707, 714-17.  The plaintiffs objected to the motto on religious grounds, and the Court determined it was impermissible to force them to either subject

-16-

themselves to criminal penalties for covering up the motto or "use their private property as a 'mobile billboard' for the State's ideological message." *Id.* at 715.

In this appeal, Mr. Cressman relies on *Wooley* to claim that the State of Oklahoma is compelling him to display the "Sacred Rain Arrow" image on his personal vehicles, thereby compelling him to communicate a message that is contrary to his religious beliefs. We agree that Mr. Cressman is being compelled to display the standard license plate image because he must choose between (1) prosecution and criminal penalties for covering up the image and (2) paying additional fees for specialty license plates that do not display the image. *See Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Tr.*, 235 F.3d 1243, 1247-48 (10th Cir. 2000). But unlike *Wooley*, Mr. Cressman's claim concerns an image rather than written words.[10]

The issue is whether, based on Mr. Cressman's allegations, the license plate image is speech that qualifies for protection under the First Amendment compelled speech doctrine.[11] This issue includes two substantive questions. First, does displaying the

---

[10] The district court correctly stated that "this case is distinguishable from *Wooley* in that it involves 'symbolic speech.'" Appx. at 347. But, as the ensuing analysis shows, symbolic speech can be eligible for First Amendment protection, including protection against compelled speech.

[11] At oral argument, counsel for the Defendants stated that the license plate image constitutes speech, but he argued it is "government speech" that is not subject to First Amendment scrutiny. *See Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech."). The concession that the image is speech seems

Continued . . .

-17-

license plate image constitute symbolic speech that qualifies for First Amendment protection? Second, if the answer to the first question is yes, does requiring Mr. Cressman to display the image on the license plate affixed to his personal vehicles violate his First Amendment rights under the compelled speech doctrine? To answer these questions, we must review the Supreme Court's decisions on symbolic speech and compelled speech.

    a. *Symbolic Speech*

"The First Amendment literally forbids the abridgment only of 'speech,'" but the Supreme Court has "long recognized that its protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989); *see Hurley*, 515 U.S. at 569 ("[T]he Constitution looks beyond written or spoken words as mediums of expression."). The First Amendment protects certain expressive conduct, such as the symbolic "wearing of an armband for the purpose of expressing certain views" about the Vietnam War, *Tinker v. De Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505 (1969), and the burning of an American flag as "the culmination . . . of a political demonstration that coincided

---

Cont.

to conflict with the district court's reasoning that displaying the image does not trigger First Amendment scrutiny.

    We cannot accept counsel's concession to reverse the district court's ruling. "A party's concession of legal error . . . cannot, standing alone, justify reversing a district court, nor can that concession relieve this court of its obligation to evaluate the merits of the legal issue presented on appeal." *United States v. Avery*, 295 F.3d 1158, 1169 (10th Cir. 2002).

with the convening of the Republican Party and its renomination of Ronald Reagan for President," *Johnson*, 491 U.S. at 406. Still, the Court has not "accept[ed] the view that an apparently limitless variety of conduct can be labeled 'speech.'" *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

*Spence v. Washington*, 418 U.S. 405 (1974) (per curiam), addresses whether the First Amendment protects the display of symbols. In *Spence*, a college student hung a United States flag outside his apartment window. *Id.* at 406. The flag was upside down and had a peace symbol attached to both sides. *Id.* He was arrested and prosecuted under a state statute that forbade the placement of "any . . . mark, picture, design, [or] drawing" on a flag, as well as the public display of such a flag. *Id.* at 407. The student challenged his conviction as a violation of his First and Fourteenth Amendment rights.

Noting that the student had not "articulate[d] his views through printed or spoken words," the Court asked "whether his activity was sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Id.* at 409. It concluded that "[o]n this record there can be little doubt that appellant communicated through the use of symbols." *Id.* at 410. The display of the flag "was a pointed expression of anguish" over foreign and domestic governmental affairs. *Id.* Further, "[a]n intent to convey a *particularized message* was present, and in the surrounding circumstances the *likelihood was great that the message would be understood by those who viewed it*." *Id.* at 410-11 (emphases added).

-19-

*Spence*'s "particularized message" language reappeared in *Johnson*, the flag-burning case. The Court restated that, "[i]n deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" *Johnson*, 491 U.S. at 404 (quoting *Spence*, 418 U.S. at 410-11). After describing the circumstances surrounding the flag burning, the Court noted that its "overtly political nature . . . was both intentional and overwhelmingly apparent," *id.* at 406—i.e., it communicated a particularized message that was likely to be understood. Accordingly, the flag burning was "sufficiently imbued with elements of communication to implicate the First Amendment." *Id.* (citation omitted) (quotations omitted).

*Spence* and *Johnson* asked whether a symbolic act or display was sufficiently imbued with elements of communication to trigger First Amendment scrutiny. *Johnson*, 491 U.S. at 406; *Spence*, 418 U.S. at 409. As part of this inquiry, the Court considered two relevant factors: (1) an intent to convey a particularized message, and (2) a great likelihood that the message would be understood by those who viewed the symbolic act or display. *Johnson*, 491 U.S. at 404; *Spence* 418 U.S. at 410-11.

In *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, a compelled speech case involving expressive conduct, the Court suggested the *Spence-Johnson* factors are not necessarily prerequisites for First Amendment protection for symbolic speech. *Hurley* concerned whether private organizers of a St. Patrick's Day

parade could be required under a Massachusetts public accommodation law to "admit a parade contingent expressing a message not of the private organizers' own choosing." 515 U.S. at 566. The organizers objected to the admission of a group of openly gay, lesbian, and bisexual descendants of Irish immigrants. *Id.* at 561.

Before addressing the compelled speech issue, the *Hurley* Court addressed whether parades constitute First Amendment activity. The Court instructed that the "inherent expressiveness of marching to make a point," *id.* at 568, was not undermined simply because a parade might "combin[e] multifarious voices" or lack an isolated, exact message, *id.* at 570. Referring to *Spence*, the Court said that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." *Id.* at 569 (citation omitted).[12]

_____

[12] After ruling that the organizers' St. Patrick's Day parade was protected under the First Amendment, the Court addressed the organizers' compelled speech claim that they could not be forced to include the gay, lesbian, and bisexual group's message. The Court agreed that the parade organizers could not be forced to include the group's message. Interestingly, its analysis indicated the message was a particularized one that others would likely understand. *See Hurley*, 515 U.S. at 574 (noting that the parade organizers "clearly decided to exclude a message [they] did not like from the communication [they] chose to make," that the group's message was "not difficult to identify," and that the message, although "not wholly articulate," suggested "that people of their sexual orientations have as much claim to unqualified social acceptance as heterosexuals"). In the end, the Court said, "it boils down to the choice of a speaker not to propound *a particular point of view*." *Id.* at 575 (emphasis added).

Federal circuit courts have interpreted *Hurley*'s effect on the *Spence-Johnson* factors differently. The Third Circuit has said that "*Hurley* left open how courts should evaluate symbolic speech claims" and "eliminated the 'particularized message' aspect of the *Spence-Johnson* test." *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 160 (3d Cir. 2002). That circuit views the *Spence-Johnson* factors as "signposts rather than requirements." *Id.*

The Second Circuit, in contrast, views the *Spence-Johnson* factors as intact after *Hurley*. *See Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 205 n.6 (2d Cir. 2004) ("While we are mindful of *Hurley*'s caution against demanding a narrow and specific message before applying the First Amendment, we have interpreted *Hurley* to leave intact the Supreme Court's test for expressive conduct in *Texas v. Johnson*."). The Sixth and Ninth Circuits seem to apply the *Spence-Johnson* factors together with *Hurley*'s statement that a "narrow, succinctly articulable message is not a condition of constitutional protection." *See Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 388 (6th Cir. 2005) (quoting *Hurley*, 515 U.S. at 569); *Kaahumanu v. Hawaii*, 682 F.3d 789, 798 (9th Cir. 2012). *But see Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060 (9th Cir. 2010) (suggesting that certain expressive activities need not satisfy the *Spence-Johnson* factors). The Eleventh Circuit has concluded that *Hurley* "liberalized" the *Spence* test such that conduct is expressive if a "reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific*

-22-

message." *Holloman ex rel. Holloman v. Hartland*, 370 F.3d 1252, 1270 (11th Cir. 2004).

As discussed later in this opinion, we do not need to grapple in this case with the precise impact of *Hurley* on the *Spence-Johnson* factors. We merely observe that *Hurley* suggests that a *Spence-Johnson* "particularized message" standard may at times be too high a bar for First Amendment protection. In addition, *Hurley* is consistent with *Spence* and *Johnson* in granting First Amendment protection for symbolic acts or displays that are sufficiently imbued with elements of communication.[13]

We now turn to the Supreme Court's discussion of compelled speech under the First Amendment.

b. *Compelled Speech*

The compelled speech doctrine has its roots in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943). In *Barnette*, the Supreme Court addressed the constitutionality of requiring public school children to engage in a "stiff-arm salute" of the American flag and to recite the Pledge of Allegiance. *Id.* at 627-28. Those who did not faced punishment for insubordination, including expulsion. *Id.* at 629. The Court

_____

[13] We recognize that *Spence*, *Johnson*, and *Hurley* each involved different forms of expression: display of a flag with peace symbols, burning a flag at a demonstration, and marching in a parade, respectively. Despite these differences, the Court has considered the expression in these cases to be "symbolic speech" and "expressive conduct." *See, e.g.*, *Johnson*, 491 U.S. at 400, 403 (referring to the flag burning as "symbolic speech" and "expressive conduct").

The display of an image on a license plate is conduct more like *Spence*, which involved the display of a symbol, than the other cases.

held that "compelling the flag salute and pledge . . . invade[d] the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control." *Id.* at 642. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Id.*

Over three decades later, the Court revisited *Barnette* in *Wooley v. Maynard*, a decision that is highly relevant to this appeal. *Wooley* concerned the constitutionality of New Hampshire's requirement that noncommercial vehicles display license plates featuring the state motto, "Live Free or Die." 430 U.S. at 713. The plaintiffs, a husband and wife, were Jehovah's Witnesses who wished not to display the motto because it was "repugnant to their moral, religious, and political beliefs." *Id.* at 707. The husband had suffered criminal penalties for covering up the motto, and the wife was equally as susceptible to state prosecution. *Id.* at 708, 710.

The Court recognized that First Amendment protection "against state action includes both the right to speak freely and the right to refrain from speaking at all." *Id.* at 714. New Hampshire's measure forced "an individual, as part of his daily life . . . to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Id.* at 715. Requiring the plaintiffs to use their personal property as a "mobile billboard for the State's ideological message or suffer a [criminal] penalty" implicated First Amendment protections and could be justified only by a "sufficiently

-24-

compelling" state interest. *Id.* at 715-16 (quotations omitted). The Court determined that New Hampshire's interest in requiring drivers to display the state motto was not sufficiently compelling. *Id.* at 716-17.

Thus, in *Barnette* and *Wooley*, the Court "invalidated [the] outright compulsion of speech." *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 557 (2005). The Court has extended the "reasoning of these compelled-speech cases . . . to certain instances in which individuals are compelled not to speak, but to subsidize a private message with which they disagree." *Id.*; *see, e.g.*, *United Foods*, 533 U.S. at 410 (noting that the First Amendment prohibits "compelling certain individuals to pay subsidies for speech to which they object"). It also has invoked *Barnette* and *Wooley* to strike down content-based government disclosure requirements that burden a plaintiff's free speech rights. *See Riley v. Nat'l Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781, 797-98 (1988) (holding it unconstitutional for the state to require professional fundraisers to disclose certain factual information to potential donors before soliciting funds). This is because the "general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid." *Hurley*, 515 U.S. at 573.

Although the *Wooley* Court described the "Live Free or Die" license plate motto as conveying an "ideological message," the Supreme Court's case law suggests that ideological speech is not the only form of forbidden compelled speech. *See Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006) ("[C]ompelled

-25-

statements of fact . . ., like compelled statements of opinion, are subject to First Amendment scrutiny."); *United Foods*, 533 U.S. at 413 (stating that speech "need not be characterized as political before it receives First Amendment protection"); *Hurley*, 515 U.S. at 573 (explaining that the compelled speech doctrine applies "to statements of fact the speaker would rather avoid"); *Riley*, 487 U.S. at 797-98 (1988) (stating that, like compelled statements of opinion, compelled statements of fact burden protected speech).

We had occasion to address a compelled speech claim in *Axson-Flynn v. Johnson*, 356 F.3d 1277 (10th Cir. 2004), in which a University of Utah theater student alleged a First Amendment violation because she was required to utter certain swear words as part of a script. *Id.* at 1281-83. We stated that, even though *Barnette* and *Wooley* involved the state compelling individuals to espouse its ideological message, those cases did not require the speech in the theater script to be ideological for the student to receive compelled speech protection. *Id.* at 1284 n.4. We explained that "First Amendment protection does not hinge on the ideological nature of the speech involved." *Id.* "Likewise, the First Amendment's proscription of compelled speech does not turn on the ideological content of the message that the speaker is being forced to carry." *Id.* The constitutional harm of compelled speech—"being forced to speak rather than to remain silent"—"occurs regardless of whether the speech is ideological." *Id.* We also found it difficult to divine a standard for determining when speech is ideological and when it is not. *Id.*

*    *    *

With the Supreme Court's discussion of symbolic speech and compelled speech in mind, we turn to whether Mr. Cressman has stated a plausible First Amendment compelled speech claim involving symbolic speech.

2. **Sufficiency of Mr. Cressman's Complaint**

At the motion-to-dismiss stage, "[w]e must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quotations omitted). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (quotations omitted). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quotations omitted).

First, we address whether Mr. Cressman's complaint plausibly alleges that displaying the image on Oklahoma's standard license plate is symbolic speech that is eligible for First Amendment protection. Second, we analyze whether Mr. Cressman has stated a plausible compelled speech claim.

a. *Mr. Cressman Alleges the License Plate Image Is Symbolic Speech*

The district court concluded that Mr. Cressman's claim failed because, although "the Native American image conceivably sends a message on some level, it is not a particularized message that viewers will likely understand." Appx. at 353. In other

-27-

words, displaying the license plate image does not satisfy the *Spence-Johnson* factors and thus is not protected symbolic speech.

On appeal, Mr. Cressman argues that, in *Hurley*, the Supreme Court abandoned the *Spence-Johnson* factors. He notes that the *Hurley* Court said a Jackson Pollock painting is "unquestionably shielded" even if it has no "succinctly articulable message." 515 U.S. at 569. Mr. Cressman takes this passage to mean that all art, including the standardized image on Oklahoma's license plate, qualifies for First Amendment protection regardless of whether the art conveys a particularized message that others would understand. Alternatively, Mr. Cressman urges adoption of the Eleventh Circuit's post-*Hurley* test for symbolic speech: whether a reasonable person would interpret displaying the license plate image as conveying "*some* sort of message, not whether an observer would necessarily infer a *specific* message." *Holloman*, 370 F.3d at 1270.

We need not decide whether the image is artwork that automatically warrants First Amendment protection.[14] Nor must we adopt a specific post-*Hurley* standard. *Hurley*

---

[14] Federal circuit courts have struggled to define the extent of First Amendment protection for visual artwork. The Second Circuit has broadly held that visual art is "entitled to full First Amendment protection," *Bery v. City of New York*, 97 F.3d 689, 695 (2d Cir. 1996), but has since questioned that precedent, *see Mastrovincenzo v. City of New York*, 435 F.3d 78, 92-93 (2d Cir. 2006). The Ninth Circuit has held that an artist's self-expression through an original painting is protected under the First Amendment "because it expresses the artist's perspective." *White v. City of Sparks*, 500 F.3d 953, 956 (9th Cir. 2007). But it has "expressly reserve[d] the question whether all paintings merit First Amendment protection" such as "copies of another artist's work or paintings done in an art factory setting where the works are mass-produced by the artist or others." *Id.* at 956 n.4; *see also Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1060-61 (9th Cir.

Continued . . .

tells us that a "particularized message" is not necessarily a requirement for constitutional protection, 515 U.S. at 569, indicating that the *Spence-Johnson* factors may, in some circumstances, be too high a threshold for First Amendment protection. But here, Mr. Cressman's complaint satisfies the more demanding *Spence-Johnson* test. It alleges that displaying the license plate image conveys a particularized message that others would likely understand.[15] The district court's contrary ruling was erroneous because it assumed or speculated about facts rather than accepting, as it should have with a motion to dismiss, the factual allegations in Mr. Cressman's complaint.

Mr. Cressman's complaint alleges the following relevant facts: The image on Oklahoma's standard license plate is a facsimile of the "Sacred Rain Arrow" sculpture. The sculpture is based on a Native American legend about a warrior who "convinced [a]

---

Cont.

2010) (holding that a tattoo is entitled to constitutional protection as a form of pure expression). The Fifth Circuit, in contrast, has said that *Hurley*'s Jackson Pollock comment "refers solely to great works of art" and that the Supreme Court has not "elaborated on the extent of First Amendment protection for visual non-speech objects or artworks." *Kleinman v. City of San Marcos*, 597 F.3d 323, 326 (5th Cir. 2010).

[15] *Spence* and *Johnson* also refer to the speaker's "*intent* to convey a particularized message." *Johnson*, 491 U.S. at 404 (emphasis added) (quotations omitted); *Spence*, 418 U.S. at 410-11 (emphasis added). In a compelled speech claim such as Mr. Cressman's, the harm is that the speaker is compelled to convey a particularized message to which he objects. In other words, a compelled speech plaintiff does not *intend* to convey the unwanted message, but is forced to. *See Wooley*, 430 U.S. at 715 (explaining that the plaintiffs were forced to become an "instrument for fostering" the state's viewpoint).

We view the compulsion aspect of Mr. Cressman's compelled speech claim to satisfy any intent requirement under *Spence* and *Johnson*.

-29-

medicine man to bless his bow and arrows" and who then "knelt down and sent his arrows into the sky with the hope of gaining favor with the 'rain god.'" Appx. at 190. The license plate image retells this story and conveys a message that promotes "pantheism, panentheism, polytheism, and/or animism," to which he objects on religious grounds. *Id.* at 191. Observers of this image "will understand that the plate communicates ideas and messages . . . about Native American culture and practices." *Id.* at 190. Further, upon seeing the image, Mr. Cressman "discerned that the image depicted and communicated Native American religious beliefs in contradiction to his own Christian religious beliefs." *Id.*

Accepting these factual allegations as true, we conclude that Mr. Cressman has alleged that displaying the image conveys a particularized message that viewers likely would understand. His complaint plausibly ties the license plate image to a specific sculpture that conveys a specific message. Further, he sufficiently alleges that others will perceive that the image conveys the message to which he objects. As to whether others are in fact likely to perceive the message Mr. Cressman alleges, further factual development through discovery may or may not support his allegation, but we cannot question it at this stage of the litigation.

In reaching the opposite conclusion, the district court relied heavily on *Troster v. Pennsylvania State Department of Corrections*, 65 F.3d 1086 (3d Cir. 1995), a case reaching the circuit court from a different procedural context than Mr. Cressman's case did here. In *Troster*, the Third Circuit addressed a correctional officer's claim that he

was compelled to speak because he was required to wear an American flag patch on his uniform. *Id.* at 1089. The circuit court affirmed the district court's denial of a preliminary injunction on this claim. It concluded that the plaintiff "presented the district court with no evidence (for example, surveys) suggesting that anyone (other than himself) would be likely to view the wearing of the patch as communicative or expressive, or that people who wear such uniforms with such flag patches actually assert anything to anyone." *Id.* at 1092.

The *Troster* court did not hold, as a matter of law, that displaying a flag patch could never constitute speech. Instead, it held that the district court's "*factual conclusion* that wearing the flag patch . . . does not convey any agreement or disagreement with all or any of the many things a flag may symbolize" was sufficiently supported in the record and thus was not an abuse of discretion. *Id.* (emphasis added) (quotations omitted). The appellate court's ruling was premised on Mr. Troster's failure to meet his evidentiary burden to show, after an opportunity to develop the record, that wearing a flag patch on his uniform "constitute[d] an expressive or communicative use of the flag." *Id.* (quotations omitted).

Here, the parties have not had an opportunity to develop the record. The district court held no evidentiary hearing and dismissed Mr. Cressman's complaint before discovery. Realizing that *Troster*'s ruling was based on Mr. Troster's evidentiary failings, the district court said that "even if [Mr. Cressman] had produced evidence that others might perceive him to be signaling a message about his religious beliefs by driving

-31-

a car bearing the standard Oklahoma license plate, [it] would still conclude that [he] has not been coerced to speak in violation of the First Amendment." Appx. at 352. This ruling ignores Mr. Cressman's allegations and suggests that no matter what facts he could prove to support his claim—even facts showing that Oklahoma residents would understand the image to convey a religious message—the claim could never succeed. We disagree.

Claims involving symbolic speech depend on circumstances and context. *See Johnson*, 491 U.S. at 405; *Spence*, 418 U.S. at 409-10; *Tinker*, 393 U.S. at 505-14. Perhaps few viewers of the Oklahoma license plate image would perceive the particularized message Mr. Cressman alleges. But at this stage, without any evidentiary development, we must accept his allegations otherwise as true. Because the district court did not, it erred in dismissing his claim.

b. *Mr. Cressman Has Plausibly Stated a Compelled Speech Claim*

Even if Mr. Cressman's allegations are sufficient to show that the license plate image is symbolic speech that merits First Amendment protection, we still need to determine whether he has plausibly stated a claim for compelled speech protection. As noted earlier, no one contests that Oklahoma compels Mr. Cressman to display the image on his license plate. But the district court disagreed that Mr. Cressman has stated a compelled speech claim that is similar to the one in *Wooley*. It explained that, unlike New Hampshire's requirement that drivers display the "Live Free or Die" motto on their license plates, "the State of Oklahoma is not, through the image of the Native American

-32-

on its license plates, attempting to 'foster[] public adherence to an ideological point of view,' or 'disseminate an ideology.'" Appx. at 353 (quoting *Wooley*, 430 U.S. at 715, 717). In other words, the district court said the speech must be ideological and that the speech here is not.

As noted above, post-*Wooley* Supreme Court decisions suggest that compelled speech protection is not limited to ideological speech, and this court said in *Axson-Flynn* that the harm of compelled speech "occurs regardless of whether the speech is ideological." 356 F.3d at 1284 n.4. We need not rely on *Axson-Flynn* because Mr. Cressman alleges that the license plate image communicates an ideological message, putting this case squarely within the narrower reading of *Wooley*.[16]

Accordingly, Mr. Cressman's claim survives if he has alleged that the image is ideological speech, and he has done so. In *Wooley*, the plaintiffs alleged New Hampshire's motto was "repugnant to their moral, religious, and political beliefs." 430 U.S. at 707. The Court instructed that "[a] system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to

---

[16] The district court said that Mr. Cressman framed the issue as "whether he, like the plaintiffs in *Wooley*, is being compelled by the State to convey an ideological message." Appx. at 347. Mr. Cressman alleges in his amended complaint that the image "communicates or endorses others' religious beliefs," *id.* at 191, but he also argues that the district court erred in requiring that he prove an "ideological message," Aplt. Br. at 17, 20-21. He further argues that although he "need not pinpoint any ideological concern with the 'Sacred Rain Arrow' image, he can certainly do so. The image is in fact ideological in nature." *Id*. at 29.

decline to foster such concepts." *Id.* at 714. We understand *Wooley*'s ruling that the state cannot force an individual to be "an instrument for fostering public adherence to an ideological point of view he finds unacceptable," *id.* at 715, to encompass speech that conveys a religious message.

Mr. Cressman alleges that the license plate image is based on the "Sacred Rain Arrow" sculpture and conveys a religious message that conflicts with his beliefs. His allegations are sufficient to show an ideological message.

\* \* \*

In sum, Mr. Cressman has plausibly alleged that the image on the standard Oklahoma license plate conveys a particularized message that others would likely understand and therefore constitutes symbolic speech that qualifies for First Amendment protection. In addition, he has plausibly alleged that he is compelled to speak because the image conveys a religious/ideological message, covering up the image poses a threat of prosecution, and his only alternative to displaying the image is to pay additional fees for specialty license plates that do not contain the image. The allegations in his complaint therefore plausibly allege a compelled speech claim under *Wooley*.

### 3. Government Speech

The Defendants argue that the preceding analysis, as well as the district court's, is incorrect and irrelevant because the Supreme Court has implicitly overruled or limited *Wooley*. They argue that, under more recent precedent, the Oklahoma license plate image is government speech that does not trigger First Amendment scrutiny. *See Pleasant*

*Grove City, Utah v. Summum*, 555 U.S. 460, 467 (2009) (noting that the Free Speech Clause does not apply when the government speaks for itself).

Circuit courts should be very careful to suggest the Supreme Court has implicitly reversed itself, especially because, of course, the Court can and should speak for itself. *See United States v. Hatter*, 532 U.S. 557, 567 (2001) ("[I]t is [the Supreme] Court's prerogative alone to overrule one of its precedents." (quotations omitted)); *see also Holcomb v. Murphy*, 701 F.2d 1307, 1310 (10th Cir. 1983) ("The Supreme Court knows how to overrule a case if it wishes to do so."), *overruled on other grounds as recognized in Gilbert v. Scott*, 941 F.2d 1065, (10th Cir. (Okla.) Aug. 9, 1991) (No. 91-6050); *Levine v. Heffernan*, 864 F.2d 457, 461 (7th Cir. 1988) ("Lower courts . . . out of respect for the great doctrine of *stare decisis*, are ordinarily reluctant to conclude that a higher court precedent has been overruled by implication."). Here, the Defendants have not shown, nor have we uncovered, Supreme Court government speech decisions that have overruled or limited *Wooley*.

For instance, it appears the Court had an opportunity to overrule or limit *Wooley* in *Johanns v. Livestock Marketing Association*, 544 U.S. 550 (2005), but it did not. In *Johanns*, the Court addressed whether a federal program violated beef producers' First Amendment rights by requiring them to pay an assessment to fund promotional messages such as "Beef. It's What's for Dinner." *Id.* at 553-54. The Court determined that "[t]he message of the promotional campaigns [was] effectively controlled by the Federal

Government itself," *id.* at 560, and that compelled funding of such government speech did not implicate the First Amendment, *id.* at 559.

The *Johanns* Court discussed *Wooley*. *Id.* at 557. It explained that the beef assessment to fund government advertising was different from a compelled speech claim, such as the one in *Wooley*, because the record did not establish that the government's beef advertisements could be attributed as the speech of the individual respondents. *See id.* at 566 ("Whether the *individual* respondents who are beef producers would be associated with speech labeled as coming from 'America's Beef Producers' is a question on which the trial record is altogether silent."). Referencing *Wooley*, the Court recognized that beef producers might have a "valid objection if those singled out to pay the tax [were] closely linked with the expression in a way that [made] them appear to endorse the government message." *Id.* at 565 n.8 (quotations omitted) (citation omitted).

Here, the Defendants contend that the image on the license plate is Oklahoma's speech, not Mr. Cressman's. But their argument misses the mark. Even in *Wooley* the speech at issue was "the State's ideological message." 430 U.S. at 715. The relevant question is whether Mr. Cressman is "closely linked with the expression in a way that makes [him] appear to endorse the government message." *Johanns*, 544 U.S. at 565 n.8.

*Wooley* answers that question. There, the Court said that a driver's vehicle is private property and is "readily associated with its operator." 430 U.S. at 717 n.15. It further stated that, although drivers were engaged in "the passive act of carrying the state motto on a license plate," they were forced to "use their private property as a 'mobile

-36-

billboard' for the State's ideological message" and "to be an instrument for fostering

public adherence to an ideological point of view." *Id.* at 715. In other words, in the

*Wooley* Court's view, speech on a license plate is sufficiently linked to the driver of the

automobile displaying the license plate to raise compelled speech concerns.

In his *Wooley* dissent, then-Justice Rehnquist said he did not agree with the

majority's "fiction" that drivers, by virtue of displaying a state motto on their license

plates, were affirming or professing a belief in the motto. *Id.* at 722 (Rehnquist, J.,

dissenting). The Defendants here essentially ask us to adopt this position. However

persuasive that may be, we have seen no indication that the Court has adopted this

analysis and overruled or limited *Wooley*.

\*       \*       \*

Mr. Cressman's complaint states a plausible compelled speech claim. He has

alleged sufficient facts to suggest that the "Sacred Rain Arrow" image on the standard

Oklahoma license plate conveys a particularized message that others are likely to

understand and to which he objects. Because the district court did not accept Mr.

Cressman's allegations as true, we reverse its dismissal of his complaint. We also reverse

its denial of Mr. Cressman's motion for a preliminary injunction because that ruling was

predicated on the dismissal of his compelled speech claim.

We do not address Oklahoma's countervailing interest in placing the image on the

license plate. The district court did not address that issue, and it is not adequately briefed

on appeal. In addition, we decline Mr. Cressman's invitation to grant a preliminary injunction because the district court is better suited to determine that issue.

## III. CONCLUSION

For the foregoing reasons, we reverse the district court's order dismissing Mr. Cressman's complaint and denying his motion for a preliminary injunction. We also conclude that Ms. Allen is not a proper defendant for suit in her official capacity.[17] This case is remanded for further proceedings consistent with this opinion.

---

[17] Ms. Allen asks this court to dismiss the 42 U.S.C. § 1983 claims against her in her individual capacity because she is entitled to qualified immunity. We leave this issue to the district court to consider on remand.



No. 12-6151, Keith Cressman v. Michael C. Thompson, et al.

**KELLY**, Circuit Judge, dissenting.

In 2009, Oklahoma changed its standard-issue license plate to incorporate a representation of Allan Houser's "Sacred Rain Arrow," on permanent display at Tulsa's Thomas Gilcrease Institute of American History and Art.[1] Though awarded the Automobile License Plate Collectors Association's best plate of the year award for 2009,[2] Mr. Cressman considers his display of the image on the license plate to be compelled speech. The district court disagreed.

This court concludes that Mr. Cressman has stated a claim because the complaint "plausibly ties the license plate image to a specific sculpture that conveys a specific message," which according to Mr. Cressman, others are likely to perceive. In my view, the complaint does not contain sufficient factual allegations "to raise [the] right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

Mr. Cressman has connected the image on Oklahoma's license plate to the sculpture and that sculpture to a Native American legend. He asserts that the license plate promotes "pantheism, panentheism, polytheism, and/or animism," all of which are antithetical to his religious beliefs. Doc. 1 at 6, ¶ 25–26. However,

---

[1]    See Quick Facts, Thomas Gilcrease Museum, http://gilcrease.utulsa.-edu/ Explore/Quick-Facts (last visited May 28, 2013).

[2]    See ALPCA's Best Plate of 2009, ALPCA, http://www.alpca.org/-bestplate/2009 (last visited May 28, 2013).

he has not alleged facts from which we can reasonably infer that others are likely to make the same series of connections.

This is especially so when the image is considered in context.  See <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009) ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.").  Native American culture is an integral part of the history of Oklahoma and the United States.  Indeed, the name "Oklahoma" comes from two Choctaw words meaning "red people."[3]  Oklahoma has decided to acknowledge its history by portraying a Native American cultural image on its license plate and promoting "Native America."  Without more, Mr. Cressman's allegation that others are likely to perceive an ideological message based upon the image—as opposed to a historical or cultural message—lacks facial plausibility.

As the court notes, we need not address the scope of protection afforded to non-ideological speech because Mr. Cressman alleges that the license plate's message is ideological.  Therefore, he must satisfactorily allege that others are likely to perceive the image as communicating an ideological message; of course, whether others agree or disagree with the message is not relevant.  See <u>Wooley v.</u>

---

[3]  Muriel H. Wright, <u>Contributions of the Indian People to Oklahoma</u>, Oklahoma Historical Society's Chronicles of Oklahoma, http://digital.library.-okstate.edu/chronicles/v014/v014p156.html (last visited May 28, 2013).

Maynard, 430 U.S. 705, 715 (1977). This he has not done and we are not required to accept unreasonable inferences. See Moss v. U.S. Secret Serv., 572 F.3d 962, 971 (9th Cir. 2009). Mr. Cressman's assertion that he is being forced "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable" is built entirely on speculation. Wooley, 430 U.S. at 715.

Moreover, the compelled speech doctrine never was intended to displace governmental choices in favor of complete personal autonomy. Otherwise, aesthetics-based challenges would not be far away. Suppose one objected to the selection of a particular artist's work or a certain color scheme? No one would suggest a First Amendment right to override the choices made by the state on these grounds.

Because I conclude that Mr. Cressman has failed to nudge his complaint across the line from possible to plausible, see Iqbal, 556 U.S. at 678, I respectfully dissent. I would affirm the district court's order dismissing Mr. Cressman's complaint.